IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLAYTON THOMAS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BEN VARNER, et al. | : | NO. 02-4778 |

## MEMORANDUM OF LAW

On June 10, 2003, this Court ordered an evidentiary hearing with respect to petitioner's claim of ineffective assistance of counsel for failing to litigate a motion to suppress the in-court identification of Peter Fuller. As this Court recognized in its accompanying Memorandum of Law, the instant petition for writ of habeas corpus is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, et seq (AEDPA), which modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state court convictions are given effect to the extent possible under the law. Bell v. Cone, 122 S.Ct. 1843, 1849 (2002). See also Calderon v. Coleman, 119 S.Ct. 500, 503 (1998) (AEDPA validates the "presumption of finality and legality" that attaches to a criminal conviction at the conclusion of direct review," quoting Brecht v. Abramson, 507 U.S. 619 (1993)).

Under AEDPA, a federal court may **not** overturn a state court's resolution of the merits of a constitutional issue **unless** (1) the state decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state decision was based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(1),

(d)(2). In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000), the United States Supreme Court held that § 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in the state court." 120 S.Ct. at 1523. That is, the writ may issue only under two narrow circumstances - defined by the "contrary to" clause and the "unreasonable application" clause - both of which require more than a mere finding that the state court's decision is incorrect. Id. at 1520, 1523. In assessing the state court's ruling under AEDPA, the federal court must give the state court the benefit of the doubt and must defer to the strong presumption that the state court knows and follows the law. Woodford v. Visciotti, 123 S.Ct. 357 (2002) (readiness on part of federal court to attribute error to state court is inconsistent with the presumption that state court knows and follows the law). The requirement that federal courts respect state court decisions on federal questions represents a marked departure from prior habeas practice, particularly in the review of mixed questions, i.e., questions involving an application of the law to the facts. See Hartey v. Vaughn, 186 F.3d 367, 371 (3d Cir. 1999) (Section 2254(d) firmly establishes that the state court decision is the starting point for habeas review).

     Under AEDPA, the federal habeas court must assess the reasonableness of the state court determination in light of governing Supreme Court precedent. Strickland v. Washington, 466 U.S. 668 (1984) governs petitioner's claim of ineffective assistance of counsel. Under Strickland, counsel is presumed effective. To overcome this presumption, a defendant must prove that counsel's conduct was so unreasonable that no competent lawyer would have followed it, and that counsel has made errors so

serious that counsel was not functioning as 'counsel' guaranteed ... by the Sixth Amendment."  Strickland, 466 U.S. at 687.

In addition, petitioner must prove prejudice, that "counsel's errors were so serious as to deprive [the petitioner] of a fair trial whose result is reliable."  Id.  In other words, a petitioner must demonstrate a reasonable probability that, but for counsel's professional dereliction, "the result of the proceeding would have been different."  Id., at 694.  This determination also assumes, absent grounds to the contrary, "that the judge or jury acted according to law."  Id.  Furthermore, such determination must be made in light of "the totality of the evidence before the judge or jury." Id., at 695.

While acknowledging the applicable standards of AEDPA and Strickland, this Court nevertheless determined that an evidentiary hearing was required to resolve petitioner's claim that counsel was ineffective for not moving to suppress the in-court identification by Peter Fuller.  This Court concluded that it could not find that the state court's rejection of this claim of ineffective assistance was either a reasonable application of or contrary to Strickland, because, in its view, the Superior Court relied on speculation rather than facts of record in finding that trial counsel elected not to litigate a motion to suppress Fuller's identification as a matter of strategy.  Noting that Strickland requires an analysis based on a complete record, this Court therefore concluded that an understanding of counsel's thought process was necessarily required, citing Marshall v. Hendricks, 307 F.3d 36, 115 (3d Cir. 2002).  Contrary to this Court's view, however, the state courts' conclusion that trial counsel acted pursuant to a reasoned strategy with respect to Mr. Fuller's identification testimony was based on facts of record.  For example, the record establishes that Charles P. Mirarchi, Esquire, counsel for petitioner

and Eugene Tinari, Esquire, counsel for the co-defendant, withdrew previously filed motions to suppress the identifications during the voir dire (N.T. 5/23/94, 2-3) (attached as Exhibit "A").  Thus, there is no question that trial counsel considered the tactic of attempting to suppress identification testimony but ultimately decided against that course.

As Strickland explains, having identified the particular act or omission that is alleged not to have been the result of reasonable professional judgment, the court must then determine whether:
> in light of all the circumstances, the identified acts or omissions were outside of the range of professionally competent assistance.  In making that determination the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, the court should recognize that counsel is strongly pre-sumed to have rendered adequate assistance and made all significant decisions in the exercise
>
> of reasonable professional judgment.

Strickland, 466 U.S. at 690.

That counsel's strategy here was reasonable under prevailing norms is plainly apparent from the record.  At the preliminary hearing, Mr. Fuller did not identify petitioner or co-defendant.  Thus, at the time when a motion to suppress would have been litigated, there was no in-court identification to be suppresses.  Indeed, as Mr. Mirarchi explained at the August 27, 2003 evidentiary hearing, he withdrew the motion to suppress because he did not expect that Mr. Fuller would identify petitioner at trial in light of his failure to identify him at the preliminary hearing.   Furthermore, as the trial

record makes clear, the defense crafted a trial strategy that relied on the fact that, at least according to Mr. Fuller's preliminary hearing testimony, there was a suggestive photographic display. Because the defense intended to elicit Fuller's testimony concerning the allegedly suggestive photographic display to show that the police had attempted to frame petitioner and the co-defendant for this crime by influencing Commonwealth witnesses Christopher Young and Peter Fuller, there was no reason for the defense to litigate a motion to suppress the photographic identification. Thus, in his opening statement, trial counsel informed the jury that it would hear that Detective Piree had supposedly influenced the identification of Peter Fuller by showing him two photographs of petitioner and the co-defendant and suggesting that they were the perpetrators (N.T 5/24/94, 111-112). Indeed, the record also shows that but for the strategic choice of trial counsel to elicit Mr. Fuller's testimony concerning the photographic display, the jury would not have learned of this identification. The prosecutor did not refer Mr. Fuller's identification in his opening nor did he elicit question Mr. Fuller on direct examination concerning this identification.

In keeping with his previously announced strategy, however, trial counsel extensively cross-examined Mr. Fuller about the allegedly suggestive conduct of Detective Piree in showing him photographs of petitioner and the co-defendant which Fuller then identified as the robbers.

Thus, the record shows that, contrary to this Court's view, the defense did not elicit Mr. Fuller's photographic identification merely in response to Mr. Fuller unexpected identification of petitioner at trial. Rather, from the start of trial, Mr. Mirarchi elected to affirmatively use Mr. Fuller's claim that Detective Piree had attempted to influence his

identification of petitioner by allegedly choosing his photograph from a group as part of the defense attack on the integrity of the Commonwealth evidence against petitioner by showing that the police had manufactured and manipulated the evidence.

Thus, in explaining the defense theory to the jury in his opening statement, Mr. Mirarchi first referred to Christopher Dinwiddie Young's anticipated testimony. Young, a witness who knew both petitioner and the co-defendant prior to the crime, was the first one to identify petitioner and the co-defendant as the robbers. As Mr. Mirarchi put it, the Commonwealth's entire case rose or fell on the strength of Young and "... when it comes to the end, if you decide that [Young] is telling the truth then you will find my client guilty. If you think he is not telling the truth then I'm going to ask you to find the defendant not guilty of all charges" (N.T. 5/24/94, 106).

Mr. Mirarchi then argued that the only the reason Young had named Clayton Thomas as the shooter and Shaurn Thomas, as his accomplice in the robbery and murder of Harry James, was because the police, specifically the assigned detective, Jeffrey Piree, had threatened to arrest Young for the murder unless he implicated petitioner and the co-defendant as the perpetrators. However, Mr. Mirarchi also candidly informed the jury that the detective would not admit doing this (id at 112) but as Mr. Mirarchi further explained, there was proof from another source to corroborate Young's claim of police coercion -- namely, the testimony of Peter Fuller, another eyewitness, who also claimed that Detective Piree had attempted to influence him during a photo-array (id. at 109-11). Indeed, Mr. Mirarchi told the jury that Mr. Fuller had already testified under oath, at the preliminary hearing, that Detective Piree had selected the pictures of the petitioner and co-defendant from a larger group of

photographs and suggested to him that they were the perpetrators (N.T. 5/24/94, 109-111).  Plainly, trial counsel intended to use the allegedly suggestive photo identification by Mr. Fuller to buttress the defense claim that Young too was coerced by the same detective who allegedly coerced Mr. Fuller.  This strategy met with prevailing professional norms.  Indeed, counsel for the co-defendant employed the same tactic. Under Strickland, attorney performance is judged by an objective standard of reasonableness, "viewed to the extent possible from the attorney's perspective at the time, without 'the distorting effects of hindsight.'"  Duncan v. Morton, (3d Cir. 2001), quoting Strickland, 466 U.S. at 688-90.  Given Fuller's failure to identify petitioner and the co-defendant at the preliminary hearing, Mr. Mirarchi had every reason to expect that, at trial, Mr. Fuller similarly would be unable to positively identify petitioner.  Petitioner's current focus on the fact that ultimately Fuller did identify him at trial is precisely the type of hindsight evaluation that Strickland prohibits.

      Furthermore, petitioner cannot show that trial counsel was ineffective for not moving after-the fact to suppress and/or strike the in-court identification by Fuller once it occurred at trial.  In the first place, a motion to suppress evidence must be made pretrial, unless the opportunity did not previously exist, or the interest of justice otherwise requires.  See Pa.R.Crim.Pro. 581(B) (former rule 323).  As petitioner knew of the allegedly suggestive photographic identification as of the preliminary hearing on March 25, 1993, he could not possibly show that he did not have the opportunity to litigate a suppression motion on this ground prior to the time that Fuller testified at trial. See Commonwealth v. Johnson, 484 Pa. 545, 400 A.2d 583 (1979) (where defendant knew of allegedly suggestive identification prior to trial and failed to file a motion to

suppress, he waived any objection when witness identified him at trial).

Nor did the interests of justice require that petitioner be permitted to litigate his withdrawn suppression motion mid-trial.  Whether a trial judge should hear an untimely suppression motion based on the "interests of justice" exception is matter of discretion to be exercised only where the merits of the suppression motion is apparent that justice requires it be heard.  Commonwealth v. Long,  753 A.2d 272 (Pa. Super. 2000).  Based on the conflicting testimony of Mr. Fuller and Detective Piree at the preliminary hearing with respect to whether a suggestive identification had even occurred, the merits of the forgone suppression claim was by no means apparent.<1>

In any event, the strategy that trial counsel actually followed -- cross-examining Mr. Fuller concerning his prior failure to identify petitioner at the preliminary hearing was an objectively reasonable one designed to undermine Mr. Fuller's in-court identification.  Trial counsel immediately elicited that at the preliminary hearing, only four months after the crime, Mr. Fuller had testified under oath that he could not identify petitioner (N.T. 5/25/94, 131).  Trial counsel then suggested and Mr. Fuller agreed that "something" had happened during the time between the preliminary hearing and the trial that allowed Mr. Fuller to now identify petitioner.  When Mr. Fuller stated that he felt "uncomfortable" at the preliminary hearing, trial counsel belittled this explanation and pressed Mr. Fuller to explain the nature of his "discomfort."  Mr. Fuller was not particularly articulate on this point as he simply repeated that he was nervous at the preliminary hearing and believed that the proceeding was unfair to him (id. at 132).  Trial counsel then read portions of Mr. Fuller's preliminary hearing testimony re-inforcing his prior failure to identify petitioner.

Changing his focus, trial counsel next elicited that, in addition to failing to identify petitioner at the preliminary hearing, Mr. Fuller had also told Detective Piree "on more than one occasion" that he was not really sure who had shot the victim (id. at 135).  Trial counsel then inquired whether Mr. Fuller had "gone over" his testimony with the assistant district attorney, implying that he was pressured to be a better witness at trial than before, and thus intimating further manipulation of the evidence against petitioner (id.).  After emphasizing Fuller's prior inability to identify anyone at the preliminary hearing, or during police questioning, trial counsel then elicited Fuller's testimony about the manner in which Detective Piree allegedly showed him photographs.  Fuller agreed, as he had testified at the preliminary hearing, that Detective Piree had selected petitioner's photograph from a larger group and asked if he was one of the robbers.  Trial counsel also elicited Fuller's opinion that he would not have identified anyone if Detective Piree had not first selected the photographs.  Because trial effectively impeached Fuller with his prior failure to identify petitioner at the preliminary hearing, petitioner cannot show that trial counsel's decision to forgo the suppression claim fell below an objective standard of reasonableness.  See Killebrew v. Endicott, 992 F.2d 660 (7th Cir. 1993)(counsel's decision to challenge the credibility of eyewitness through extensive cross-examination concerning prior failure to identify defendant was a reasonable trial tactic which defeated claim of ineffective assistance based on counsel's failure to object to witness' in-court identification of defendant as robber).  As Strickland teaches, "[t]here are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."  466 U.S. at 689.  That petitioner's current counsel would have proceeded

in a different manner than trial counsel did with the respect to eyewitness Peter Fuller fails to overcome the presumption that trial counsel's representation was constitutionally deficient. On the contrary, petitioner's present claim is based on nothing but a hindsight re-evaluation of what transpired at trial. This is precisely the type of argument that <u>Strickland</u> rejects. Furthermore, trial counsel's strategic choice must not be considered in a vacuum. In the unlikely event that trial counsel had prevailed on a mid-trial motion to suppress or strike Mr. Fuller's in-court identification, the jury would have been instructed to disregard the identification. By electing instead to cross-examine Mr. Fuller about his prior failure to identify petitioner at the preliminary hearing, trial counsel took full advantage of the opportunity to read those portions of Mr. Fuller's preliminary hearing testimony wherein he had repeatedly indicated that he could not identify either petitioner or the co-defendant. The jury also had an opportunity to observe Mr. Fuller struggle to explain his change of testimony. Through cross-examination, trial counsel had the opportunity to exploit Mr. Fuller's prior failure to identify petitioner when confronted with him approximately four months after the crime. As the witness' prior failure to identify petitioner when he saw him approximately four months after the crime weighed against the reliability of his in-court identification more than two years later, it was objectively reasonable for trial counsel to pursue this strategy. Accordingly, petitioner cannot show that it is reasonably probable that the trial outcome would have been different but for trial counsel's decision to attempt to undermine Mr. Fuller's recovered memory by rigorous cross-examination rather than moving after-the-fact to suppress and/or strike Mr. Fuller's in-court identification.

Moreover, as the record also makes clear, this was not a case that rose or fell on

the quality of the witnesses' identification testimony. On the contrary, Christopher Young knew petitioner and Shaurn Thomas before the crime. Trial counsel for both petitioner and the co-defendant recognized that Young's credibility was the linchpin of the Commonwealth's case. Trial counsel emphasized this in his opening statement.<2> Even if Christopher Young had recanted his prior statements and preliminary hearing testimony implicating petitioner as the shooter -- which, incidentally, he did not do -- Young's prior statements were admissible as substantive evidence under Commonwealth v. Lively, 530 Pa. 464, 610 A.2d 7 (1992) and Commonwealth v. Brady, 510 Pa. 123, 507 A.2d 66 (1986). This evidence, if accepted by the jury, was more than enough to convict petitioner. As part of the overall defense strategy to discredit all of the evidence implicating petitioner as the result of police coercion and manipulation, Mr. Mirarchi played up the supposedly suggestive photo identification by Fuller to show that just as Fuller claimed that police had improperly conducted a photo display in order to obtain an identification from him, Young's statements incriminating petitioner too had been extracted by police misconduct (id at 111-112). This strategy had the potential to convince the jury to disregard whatever prior statements and testimony that Young had given which implicated petitioner and the co-defendant. Unfortunately for petitioner, however, at trial Young -- perhaps in reaction to being badgered about his less than consistent accounts -- reacted viscerally and dramatically identified petitioner no less than five times as the man who robbed and shot the victim and shot Peter Fuller (N.T. 5/25/94, 65, 80, 82, 89, 91). By contrast, at trial Young did not implicate the co-defendant but rather insisted that he had not seen the second robber. That Young identified petitioner as the shooter a trial while at the same time maintaining that he had

not seen the second robber is the fundamental difference in the Commonwealth's proof against the two defendants here.  For this reason, presumably, the jury voted to acquit the co-defendant but having observed Young at trial repeatedly identify petitioner as the shooter, the jury thus concluded that petitioner was guilty beyond a reasonable doubt.  Accordingly, the fact that the co-defendant was acquitted does not advance petitioner's claim that his counsel was ineffective for electing to forgo a suppression claim with respect to Fuller.

Finally, the record establishes that Fuller's in-court identification of petitioner was, at most, corroborative of Young's unequivocal testimony that petitioner was the shooter.  After all, the jury first heard Young repeatedly identify petitioner at trial as the man who killed Mr. Harry and shot Mr. Fuller.  In addition, at trial Young re-iterated parts of his prior statements implication petitioner.  Only after the jury heard Young testify that petitioner was the shooter did the jury hear from Mr. Fuller.  While Young had identified petitioner as the shooter at the preliminary hearing and at trial, Mr. Fuller's trial identification of petitioner was impeached by his prior failure to identify anyone at the preliminary hearing.  Thus, the jury had ample proof to find petitioner guilty beyond a reasonable doubt without Fuller's testimony.  Thus, petitioner cannot show that but for trial counsel's failure to move for suppression of Mr. Fuller's in-court identification, the trial outcome would have been different.

**II. BECAUSE THE RECORD DEMONSTRATES THAT FULLER'S IN-COURT IDENTIFICATION OF PETITIONER WAS INDEPENDENTLY BASED ON HIS OPPORTUNITY TO VIEW PETITIONER DURING THE CRIME, A MOTION TO SUPPRESS FULLER'S IDENTIFICATION TESTIMONY WOULD HAVE FAILED.**

In any event, it is well settled that counsel will never be ineffective for failing to file a non-meritorious motion. Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000); Accord Kimmelman v. Morrison, 106 S.Ct. 2574 (1986)(failure to file a motion to suppress is not per se ineffective assistance of counsel).  Because the record here demonstrates that Fuller's in-court identification of petitioner was independently based on his observations at the time of the crime, a motion to suppress Fuller's in-court identification would have failed.  As this Court observed, even where it is shown that a suggestive identification procedure has occurred, suppression is not warranted where it is shown that the identification testimony is nevertheless derived from an independent basis and is therefore reliable.   Relying on the Third Circuit's opinion in United States v. Higgins, 458 F.2d 461 (3d Cir. 1972), this Court noted the following seven factors to be considered in determining whether an in-court identification is the product of an independent source:

(1) the manner in which the pre-trial identification was conducted;

(2) the witness' prior opportunity to observe the alleged criminal act;

(3)    the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification;

(4)    any previous identification by the witness of some other person;

(5)    any previous identification of the defendant himself;

(6) failure to identify the defendant on a prior occasion; and

(7) the lapse of time between the alleged act and the out-of-court identification.

When these factors are considered in their totality, it is clear that Fuller's identification of petitioner was constitutionally sound. Given the contradictory testimony of Mr. Fuller and Detective Piree as to whether or not the detective initially directed Mr. Fuller's attention to petitioner's photograph, the manner in which the photo display was conducted remains in dispute. It goes without saying, however, that if Detective Piree's testimony is credited, then there is no basis upon which Fuller's in-court identification testimony would have been suppressible. That Fuller failed to identify petitioner at the preliminary hearing is not a grounds for suppression but rather affects only the weight of his trial identification testimony. Apart from the question whether the detective suggested a particular photograph, Mr. Fuller testified at the preliminary hearing that on February 4, 1993 (the date of the relevant photographic display), Detective Piree showed him photographs exclusively of black males (N.T. 3/25/93, 21). According to Mr. Fuller these photographs were not in a book but the detective handed him single photographs which he went through like a deck of cards (N.T. 3/25/93, 43). Obviously, if the photographic display occurred without any suggestion by Detective Piree, there is no need for this Court to consider the remaining factors. Assuming arguendo that this Court finds that the photographic display occurred as Fuller described it at trial, it is nevertheless clear that, considering the totality of the Higgins factors, Mr. Fuller's identification of petitioner at the time of trial was based on his ability to view him at the time of the crime.

At the preliminary hearing, Mr. Fuller testified about his prior opportunity to view

the shooter. According to Mr. Fuller, he was playing chess when petitioner announced the hold-up. Mr. Fuller saw petitioner pull out a pistol and heard him announce a hold-up. Mr. Fuller estimated that at that time he was approximately two and one-half feet from the gunman and the victim (N.T. 3/25/93, 10-11). He saw the victim grab at petitioner's gun and when a shot rang out, Fuller dropped to the floor. Fearing that the gunman would kill him, Mr. Fuller attempted to flee and ran into the kitchen. When he found the back door locked, however, he reluctantly returned to the front room where he again confronted petitioner. At this point, Mr. Fuller estimated that he was approximately eight feet away from the shooter who stood facing him and demanded "Do you want some of this?" As Mr. Fuller again dropped to the floor, he was hit by a bullet in his right shoulder (N.T. 3/23/93, 13-15). Given the proximity of Mr. Fuller and the level of attention to his armed assailant who the record otherwise establishes wore no mask or facial covering (N.T 5/25/94, 35), it is clear that Mr. Fuller had an excellent opportunity to view the man who killed Mr. Harry and shot him.

The record also establishes that there are no discrepancies between Mr. Fuller's description of his assailant on the night of the crime and petitioner's actual appearance. At the preliminary hearing, Mr. Fuller testified that he gave the following description of the shooter: "I seen real dark skin" which he further described as "rough skin." The shooter was 5'7" or 5'8" and he was approximately 39 to 40 years old (N.T. 3/25/93, 27). Approximately two hours after the crime, in a statement given to police at 3:40 a.m. (attached as Exhibit "B"), Mr Fuller gave the following description of the shooter:
> He was dark-skinned, thin, about 5'7" to 5' 8" tall.
> His face had rough skin. It was more like chicken
> pots (sic) but I just thought he had bad skin. He
> had on a light weight navy blue jacket about the

> same length as mine. He had on wranglers. I didn't notice his shoes. He wasn't wearing a hat. His hair was close cut. I don't think he had mixed gray hair.
>
> About 38 years old he looked to be.

A comparison of Mr. Fuller's description with the arrest photo of petitioner (attached as Exhibit "C") shows that Mr. Fuller described petitioner with a high degree of accuracy. At the time of his arrest, petitioner was 42 years old. He was thin, weighing only 142 pounds at a height of 5'7." His hair was close cropped. His skin tone is very dark and the appearance of his skin in the photograph confirms Mr. Fuller's description of being rough or in "bad" condition. The characteristics of petitioner's skin as observed by Mr. Fuller are plainly unique and thus demonstrate the reliability of his description. That Mr. Fuller was able to observe and recount these significant details supports the conclusion that he had ample opportunity to observe the shooter at the time of the crime. The similarity of Mr. Fuller's description concerning the shooter's height and weight and hair length with the same information shown on petitioner's arrest photo likewise supports the reliability of Mr. Fuller's identification. In addition, Mr. Fuller described petitioner's age within an accurate range as he said that the shooter was 39 when, in fact, petitioner was 42 years old at the time of his arrest. Finally, Mr. Fuller was able to remember the clothing worn by the shooter which also demonstrates that his attention was focused on the man who shot him and killed the victim.

Nor did Mr. Fuller identify any one else as the shooter despite being shown approximately 750 photographs of black males at the police photo gallery on January 3, 1993.

While Mr. Fuller did not identify petitioner at the preliminary hearing, he explained

that he was not positive and therefore declined to make an identification (N.T. 3/25/93, 16-17).  Finally, at trial, Mr. Fuller testified that "whatever Detective Piree said to him" did not affect his identification of petitioner at trial as the man who shot him (N.T 5/25/94, 150).  Based on this record, it is clear that a motion to suppress Mr. Fuller's identification of petitioner would have failed on the merits.  Thus, petitioner cannot show that trial counsel was ineffective for failing to attempt to suppress Mr. Fuller's identification testimony.

## CONCLUSION

For the above reasons, respondents respectfully request the petition for writ of habeas corpus be denied.

                                             Respectfully submitted,

                                             HELEN KANE
                                             Assistant District Attorney
                                             THOMAS W. DOLGENOS
                                             Chief, Federal Litigation Unit

```
                    IN THE UNITED STATES DISTRICT COURT

                 FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CLAYTON THOMAS                      :        CIVIL ACTION
                                    :
      v.                            :
                                    :
BEN VARNER, et al.                  :        NO. 02-4778
```

## CERTIFICATE OF SERVICE

I, HELEN KANE, hereby certify that on September 9, 2003, I personally served a copy of the forgoing pleading on Daniel Silverman, Esquire.

                                             _____
                                             HELEN KANE
                                             Assistant District Attorney
                                             1421 Arch Street
                                             Philadelphia PA 19102
                                             215-686-5742

                                             Attorney ID No. 26096

1Indeed, as is explained below, any motion to suppress Mr. Fuller's identification based on the allegedly suggestive photo array would fail on the merits.

2Similarly, counsel for the co-defendant explained to the jury that the only thing that was holding these defendant was vicious lie by a person with a suspicious background who told the police that the defendants' names only after the police threatened to arrest him for the crime (N.T. 5/24/94, 103).