IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLAYTON THOMAS, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | |
| VS. | : | |
| | : | |
| BEN VARNER, | : | |
| AND | : | |
| THE DISTRICT ATTORNEY OF | : | |
| THE COUNTY OF PHILADELPHIA, | : | |
| AND | : | |
| THE ATTORNEY GENERAL OF | : | |
| THE STATE OF PENNSYLVANIA, | : | |
| | : | |
| Respondents | : | NO. 02-4778 |

REPORT AND RECOMMENDATION

CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

Currently pending before the Court is a Petition for Writ of Habeas Corpus filed, pursuant to 28 U.S.C. § 2254, by a petitioner incarcerated in the State Correctional Institution at Smithfield, Pennsylvania. After an initial review of the petition, this Court opted to grant an evidentiary hearing on plaintiff's claim of trial counsel ineffectiveness for failure to seek exclusion of a tainted witness identification. Having conducted that hearing and having considered the testimony of several pertinent witnesses, the Court now recommends that the petition be granted and that petitioner be given a new trial within 120 days of the date that this Recommendation is adopted.

I.    PROCEDURAL HISTORY[1]

        Following a jury trial presided over by the Honorable Jane Cutler Greenspan of the Philadelphia Court of Common Pleas, petitioner was convicted, on May 31, 1994, of second degree murder, robbery, aggravated assault and possession of an instrument of crime.  According to the Pennsylvania Superior Court,

> The charges stemmed from the robbery of a speakeasy located in the City of Philadelphia.  Accompanied by a person who acted as lookout, [petitioner] entered the speakeasy brandishing a firearm and ordered the occupants to the floor.  The proprietor of the establishment, Harry James, had been playing chess with a customer, Peter Fuller.  Mr. James was fetching a beer for another customer when [petitioner] arrived.  Instead of complying with [petitioner's] order, Mr. James leaped at [petitioner] and began to struggle with him.  During the course of this altercation, [petitioner] shot Mr. James in the chest.  The victim subsequently died of his wound.  [Petitioner] also shot Mr. Fuller in the shoulder.  Mr. Fuller survived.

Superior Court Opinion (2000), pp. 1-2.  After the convictions, Judge Greenspan sentenced petitioner to a term of life imprisonment.  Petitioner's co-defendant and son, Shaurn Thomas, was acquitted of all charges.  Although trial counsel failed to file a timely notice of appeal, petitioner's direct appeal rights were reinstated on October 28, 1996, at which time petitioner appealed to the Pennsylvania Superior Court.  By way of memorandum opinion, issued May 5, 1998, the Superior Court affirmed the

---

[1] Much of the procedural history is taken verbatim from the initial Memorandum and Order filed on June 10, 2003, which we incorporate by reference into this opinion.

judgment of sentence.  Petitioner did not seek allowance of appeal from the Pennsylvania Supreme Court.

On April 6, 1999, petitioner filed a pro se petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541, et seq.  Thereafter, petitioner retained counsel, who filed both an amended and a supplemental petition.  Without conducting an evidentiary hearing, the PCRA court summarily denied the petitions on June 27, 2000.  The Pennsylvania Superior Court affirmed on December 12, 2001, adopting, in part, some of the reasoning of the PCRA court.  On July 9, 2002, the Pennsylvania Supreme Court denied petitioner's request for allowance of appeal.

Petitioner filed the instant Petition for Writ of Habeas Corpus on July 18, 2002, raising the following issues for review:

1.    Ineffective assistance of trial counsel for failure to object to the introduction of his co-defendant's statements which constituted a violation of his Sixth Amendment right to confrontation as set forth in Bruton v. United States, 291 U.S. 123 (1968), or to otherwise request a cautionary instruction;

2.    Ineffective assistance of trial counsel for failure to move to suppress a witness identification that was both impermissibly suggestive and constitutionally unreliable;

3.    Prosecutorial misconduct for improperly attempting to bolster the credibility of central witnesses Christopher Young and Detective Piree in violation of petitioner's Fifth and Fourteenth Amendment rights to due process.[2]

_____

[2] In his actual habeas petition, petitioner raised a fourth claim of ineffective assistance of counsel for failing to impeach the primary adverse witness with his criminal record.  Without providing any other argument, he

Upon consideration of these issues, we issued a Memorandum and Order, dated June 10, 2003, finding that petitioner's first and third claims had no merit, but that his second claim warranted an evidentiary hearing. The evidentiary hearing was conducted over the course of two days, August 27, 2003 and September 10, 2003, during which time plaintiff's trial counsel, Charles Mirarchi, and plaintiff's appellate counsel, James Bruno, testified. Although the parties were also given the opportunity to present the testimony of Peter Fuller and Detective Jeffrey Piree, and although respondent brought the two witnesses to court on September 10, 2003, both parties ultimately chose to rest on the record as it stood at that time. In light of these proceedings, we now set forth the following legal analysis.

II.  STANDARD OF REVIEW

Under the current version of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for writ of habeas corpus from a state court judgment bears a significant burden. Section 104 of the AEDPA imparts a presumption of correctness to the state court's determination of factual issues — a presumption that petitioner can only rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (1994). The statute also grants significant deference to legal conclusions announced by

thereafter refers to his "Memorandum of Law, to be filed." In that Memorandum of Law, he did not address this issue at all. Absent any further discussion by petitioner, we shall likewise not address this issue.

the state court, as follows:

> An application for a writ of habeas corpus on behalf of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless that adjudication of the claim -
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court, in the case of Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), interpreted the standards established by the AEDPA regarding the deference to be accorded to state court legal decisions, and more clearly defined the two-part analysis set forth in the statute. Williams, 529 U.S. at 404-405. Under the first part of the review, the federal habeas court must determine whether the state court decision was "contrary to" the "clearly established federal law, determined by the Supreme Court of the United States." As defined by Justice O'Connor, writing for the majority of the Court on this issue, a state court decision can be contrary to Supreme Court precedent in two ways: 1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result

opposite to that reached by [the Supreme Court]." Id. The Court explained, however, that this "contrary to" clause does not encompass the "run-of-the-mill state-court decisions" applying the correct legal rule from Supreme Court cases to the facts of the prisoner's case." Id. at 406.

To reach such "run-of-the-mill" cases, the Court turned to an interpretation of the "unreasonable application" clause of § 2254(d)(1). It found that a state court decision can involve an unreasonable application of Supreme Court precedent: 1) "if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or 2) "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context should apply." Williams, 529 U.S. at 407-408. The Court specified, however, that under this clause, "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly-established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 410.

III. DISCUSSION OF THE MERITS

As we noted in our prior Memorandum and Order, petitioner claims that counsel improperly failed to pursue a motion to suppress and/or strike two identifications made by Commonwealth witness Peter Fuller. Specifically, Mr. Fuller testified at trial, that while viewing photographic arrays after the incident, he was unable to identify anyone until Detective Jeffrey Piree took out the photograph of petitioner and his co-defendant and "suggested" that they were the ones involved. He stated that if the detective had not picked out the defendants' photographs, he "wouldn't have identified them." (N.T. 5/25/94, pp. 139-140, 146). Mr. Fuller could not identify petitioner at the preliminary hearing. Despite the impermissibly suggestive nature of this identification evidence, petitioner alleges that trial counsel improperly withdrew the motion to suppress.

The Pennsylvania Superior Court, reviewing petitioner's claim, acknowledged Mr. Fuller's concession that, prior to trial, he remained unsure of who really committed the crimes and that Detective Piree kept showing him photographs with the expectation that he would implicate someone. Notwithstanding these findings, the Superior Court held that, based on the course of cross-examination, trial counsel had an obvious trial strategy in not seeking the suppression of Mr. Fuller's identifications. It opined that the witness's testimony concerning his pre-trial

7

identification was relevant to the defense strategy of proving that the police framed petitioner for the incident so as to close the books on the matter.  Letting the jury hear that Detective Piree coerced the witness into identifying photographs advanced that strategy.  As such, the Superior Court concluded that trial counsel intentionally  chose not to suppress Mr. Fuller's in-court identification in order to develop his theory of the case.

Upon re-reviewing the record, we find this ruling to be an unreasonable application of federal law.  The Sixth Amendment to the United States Constitution recognizes the right of every criminal defendant to effective assistance of counsel.  U.S. CONST., amend. VI.  In the case of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, <u>reh'g denied</u>, 467 U.S. 1267, 104 S. Ct. 3562 (1984), the Supreme Court set forth a two-prong test — both parts of which must be satisfied — by which claims alleging counsel's ineffectiveness are adjudged.  First, the petitioner must demonstrate that his trial counsel's performance fell below an "objective standard of reasonableness." <u>Id</u>. at 688.  The Supreme Court has explained that:

> A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects
> of hindsight, to reconstruct the circumstance of
> counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time.  Because of the
> difficulties inherent in making the evaluation, a court
> must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged

action "might be considered sound trial strategy."

Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 107, 76 S. Ct. 158, 163-164 (1955)).  A convicted defendant asserting ineffective assistance must, therefore, identify the acts or omissions that are alleged not to have been the result of reasoned professional judgment.  Id. at 690.  The reviewing court must then determine whether, in light of all circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance."  Id.  It is well-established that appellate counsel cannot be ineffective for failing to raise a meritless claim.  See Strickland, 466 U.S. at 691; Holland v. Horn, 150 F. Supp.2d 706, 730 (E.D. Pa. 2001).

Pursuant to the second prong, the defendant must establish that the deficient performance prejudiced the defense. It requires a demonstration that counsel's errors were so serious as to deprive the defendant of a fair trial or a trial whose result is reliable.  Strickland, 466 U.S. at 687.  More specifically, the defendant "must show that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

The Superior Court, in this case, ended its inquiry into petitioner's claim at the first prong of the Strickland analysis by

9

finding that defense counsel's performance was based on sound trial strategy. Notably, however, they did so without ever holding any type of evidentiary hearing to inquire into counsel's rationale for withdrawing his motion to suppress. "Strickland requires an analysis based on a complete record. The reviewing court's reasoning under the first prong needs to be made with an understanding of counsel's thought process . . . so that a conclusion whether counsel was ineffective can be made based on facts of record rather than assumptions." Marshall v. Hendricks, 307 F.3d 36, 115 (3d Cir. 2002), cert. denied, 123 S. Ct. 1492 (2003) (criticizing lower court for assuming strategic considerations). The Superior Court's ruling, in this matter, was based on nothing more than speculation as to counsel's intentions. Under the clear mandate of Strickland, such speculation cannot be given unquestioned deference by his Court.

In an effort to resuscitate the state court's ruling, the Commonwealth now promulgates several arguments. First, it advocates that trial counsel's actions were, in fact, both motivated by strategy and justified by the circumstances. Second, it contends that, notwithstanding counsel's intentions, a motion to suppress and/or strike would not have had merit and, thus, counsel could not have been ineffective for failing to litigate it. Finally, even assuming that counsel was ineffective and that a motion to suppress would have had merit, the Commonwealth contends

that plaintiff cannot prove the second <u>Strickland</u> element of prejudice. For ease of discussion, we address each argument separately.

A.  Whether Counsel Acted Reasonably and Out of Sound Trial Strategy.

The Commonwealth initially claims that trial counsel's actions were well within the wide range of professionally competent assistance. In doing so, it offers three differing rationales for counsel's actions/failures. Primarily, it asserts that counsel intentionally withdrew the suppression motion in order to evoke testimony from Mr. Fuller about improper police tactics. Its second rationale contends that counsel, rather than suppressing the identification, used an objectively reasonable alternate strategy of cross-examining Mr. Fuller so as to undermine any in-court identification. Finally, the Commonwealth asserts that, even if counsel's actions were not motivated by any defined strategy, his actions were justifiable in light of the circumstances surrounding Mr. Fuller's identification.

1.  Rationale One - Counsel's Use of Mr. Fuller's Identification as Part of His Defense Strategy.

In the first portion of its argument, respondent echoes the Superior Court's opinion and contends that the defense actually intended to elicit Fuller's in-court identification and testimony concerning the allegedly suggestive photographic display to show that the police had attempted to frame petitioner for this crime.

To support this theory, the Commonwealth points to multiple record citations which allegedly evidence counsel's strategy.  It focuses, primarily, on trial counsel's opening statement, wherein he first introduced the notion of the suggestive photo array and discussed the circumstances of Mr. Fuller's out-of-court identification following Detective Piree's selection of petitioner's picture from the stack of photos.  (N.T. 5/24/94, at pp. 111-113).  Further, it notes that, when cross-examining Mr. Fuller, subsequent to his in-court identification, trial counsel specifically elicited information regarding both Mr. Fuller's inability to identify the perpetrator during the preliminary hearing and the alleged suggestivity of the various photo arrays conducted by Detective Piree.  (N.T. 5/25/94, 137-146).  Finally, the Commonwealth points to counsel's closing argument, when he again made references to the improper actions of Detective Piree at the photo array.  The underlying motivation for each these actions, argues the Commonwealth, was counsel's attempt to further his overall defense strategy that police had manufactured and manipulated the evidence.

We find this analysis flawed on several fronts.  First and foremost, we remark that, during the evidentiary hearing in this Court, counsel, Charles Mirarchi, was given the opportunity to explain his reasons for not moving, either prior to or during the trial, to suppress the in-court identification of Mr. Fuller.  Despite this opportunity, he failed to confirm that the withdrawal

of his motion to suppress constituted a deliberate attempt to introduce details of police overreaching. Indeed, at no point did he even intimate that he ever had any type of strategy or grand plan to use this identification for the defense's advantage. Rather, his sole explanation was that he was completely surprised by the identification at trial and did not know he could move to suppress it after it already had been elicited. Certainly, counsel's own words and his accompanying bewilderment regarding any suggested strategy far outweigh the unfounded speculation by the Commonwealth.

Additionally, the Commonwealth's "strategy theory" fails to explain why counsel did not move to strike/suppress the in-court identification during trial. Counsel could have easily elicited Mr. Fuller's testimony about the suggestive photo array and his statement that he only made the out-of-court identification at Detective Piree's urging, while also moving to suppress Mr. Fuller's potential in-court identification of petitioner. In doing so, counsel would have had the benefit of showing police overreaching and evidence manipulation, without the detrimental identification of petitioner as the shooter. As such, we find that counsel's failure to move to suppress and/or strike Fuller's in-court identification did not constitute reasonable trial strategy.

2.    Rationale Two - Use of an Alternative and Equally Effective Strategy.

Respondent next argues that, even though counsel did not move to suppress the identification, the strategy that trial counsel actually followed – scathing cross-examination of Mr. Fuller concerning his prior failure to identify petitioner at the preliminary hearing – was an objectively reasonable one designed to undermine Mr. Fuller's in-court identification.    Respondent specifically notes that trial counsel first belittled Mr. Fuller's explanation that he was uncomfortable at the preliminary hearing and then re-read portions of Fuller's preliminary hearing testimony wherein he could not identify petitioner as the shooter.    Next, counsel elicited that Mr. Fuller had also told Detective Piree, on more than one occasion, of his uncertainty regarding the shooter's identification and that Detective Piree had essentially coerced the out-out-court identification.    Finally, by way of cross-examination, counsel implied that the police and the assistant district attorney had pressured Mr. Fuller to be a better witness. These various tactics, according to respondent, effectively impeached Fuller, undermined his in-court identification and, thus constituted an objectively reasonable trial strategy.

What respondent fails to acknowledge, however, is that counsel's cross-examination was not a pre-planned tactic, but rather a response to an in-court identification that came as a complete surprise to him.    Counsel had the chance to move for a

14

complete suppression of Mr. Fuller's identification testimony based on an allegedly suggestive photo array.  By withdrawing the motion to suppress, counsel unwittingly surrendered this opportunity. While we recognize that the cross-examination was a valiant attempt at damage control, it does not negate the fact that counsel allowed an inculpatory identification of his client to be presented to the jury.[3]

    3.   Rationale Three - Justification for Withdrawing the Motion to Suppress.

As a final effort to vindicate counsel's actions, the Commonwealth asserts that, even assuming that counsel had no strategy in allowing Fuller's identification, his failures were justifiable and within the bounds of professional norms due to the circumstances surrounding the identification.  In particular, it contends that counsel had no basis upon which to litigate a pretrial motion to suppress.  We find little merit to this point.

During the August 27, 2003 evidentiary hearing in this Court, counsel took the stand and testified that he recalled

_____

[3] In support of its argument, respondent cites to a Seventh Circuit case wherein the court found that a defense counsel's decision to challenge the credibility of an eyewitness through extensive cross-examination concerning her prior failure to identify the defendant at a photo array was a reasonable trial tactic which defeated the defendant's claim of ineffective assistance based on counsel's failure to object to the witness's in-court identification of defendant as the robber.  Killebrew v. Endicott, 992 F.2d 660 (7th Cir. 1993).  We note, however, that this finding was essentially *dicta*, as the court already held that the procedures used during the witness's identification at the preliminary hearing were not unduly suggestive and, as such, any motion to suppress the identification at trial would have been futile.  Id. at 665.  Moreover, in that case, unlike the one at bar, the witness's description of the perpetrator was mistaken in multiple regards, thus allowing her testimony to be undermined to a greater degree. Id.

withdrawing his omnibus motion to suppress on the basis of Mr. Fuller's statement, at the preliminary hearing, that he could not positively make an identification of petitioner.  Mr. Mirarchi indicated that he had no idea that Fuller was going to identify petitioner at trial and that he was totally surprised when an identification occurred.  This "surprise," however, does not justify counsel's failures.  Once the prosecution revealed that it planned to put Mr. Fuller on as a witness at trial, Mr. Mirarchi made no additional efforts through discovery to find out whether an identification would ultimately be made at trial.  Indeed, logic alone suggested that because Mr. Fuller was both a victim and an eyewitness who had previously described the shooter, such an identification might occur.  At a minimum, counsel could have made a precautionary motion to suppress.

Moreover, even assuming that Mr. Fuller's identification was a reasonable surprise, counsel made no motion, after the fact, to suppress and/or strike the in-court identification.  In fact, during the August 27, 2003 evidentiary hearing, Mr. Mirarchi confessed that, despite his twenty-five years of practice, he did not know he could seek to strike the identification after it was made at trial.

The Commonwealth now argues that this latter failure was justified under Pennsylvania Rule of Criminal Procedure 581(B), which states that, "[u]nless the opportunity did not previously

16

exist, or the interests of justice otherwise require, such motion shall be made only after a case has been returned to court and shall be contained in the omnibus pretrial motion . . .  If timely motion is not made hereunder, the issue of suppression of such evidence shall be deemed to be waived."  The Commonwealth goes on to contend that because petitioner knew of the allegedly suggestive photographic identification as of the preliminary hearing on March 25, 1993, he could not possibly show that he did not have the opportunity to litigate a suppression motion on this ground prior to the time that Fuller testified at trial.  Nor did the interests of justice require that a suppression motion be heard mid-trial since the merits of the motion were by no means apparent.

Again, we cannot agree with the Commonwealth's argument. Pennsylvania Rule of Criminal Procedure 581(B) sets forth two instances in which an untimely motion to suppress may be heard: (1) when the opportunity to raise it did not previously exist or (2) when the interests of justice otherwise require.  Whether either of these situations exist "is a matter for the discretion of the trial judge."  Commonwealth v. Long, 753 A.2d 272, 279 (Pa. 2000) (quoting Commonwealth v. Cooke, 294 A.2d 1271, 1274 (Pa. Super. 1978).

Both situations could have been met in the case at bar. Under the first prong, the Commonwealth itself concedes that "at the time when a motion to suppress would have been litigated, there

17

was no in-court identification to be suppresse[d]."[4]    See
Respondent's Memorandum of Law, at p. 5.  Turning to the second
prong of Rule 581(B), "[a] trial judge should exercise discretion
to hear an untimely oral suppression motion . . . in such
situations 'where the merits of counsel's oral motion were so
apparent that justice required it be heard.'"  Long, 753 A.2d at
280 (internal quotations omitted).  In light of Mr. Fuller's
consistent and unwaivering testimony that Detective Piree selected
petitioner's photograph from a larger group and then asked whether
petitioner was the shooter, we can reasonably presume that the
trial court would have exercised its discretion to hear the
suppression motion, even notwithstanding Detective Piree's
testimony to the contrary.  Consequently, Rule 581(B) would not
necessarily have foreclosed a motion to suppress and/or strike made
during trial.

---

[4]  In support of its argument, respondent cites the case of Commonwealth
v. Johnson, 400 A.2d 583, 587 (Pa. 1979).  In that case, the appellant argued
that the trial court erred in admitting a witness's in-court identification
where the identification was allegedly tainted by a suggestive pretrial
identification.  Appellant, however, did not object to the identification
testimony until after it was given, when he moved that the testimony be
stricken.  The court held that because appellant knew of the allegedly
suggestive pretrial identification prior to trial, yet failed to file a motion
to suppress the identification, the issue was waived.  Id.
     The case at bar is distinguishable due to the intervening preliminary
hearing.  While there was an allegedly suggestive pretrial identification in
which Mr. Fuller inculpated petitioner, Mr. Fuller failed to make any
identification during the subsequent preliminary hearing.  Trial counsel
testified that, based on that failure, he did not believe that Mr. Fuller
would make an identification at trial.

In sum, we cannot find that trial counsel's actions fell within the wide range of reasonably professional assistance. Counsel clearly did not act based on any defined trial strategy – a fact made evident by counsel's own testimony during evidentiary proceedings before this Court. Nor can we say that trial counsel's withdrawal of his pre-trial motion to suppress the in-court identification and subsequent failure during trial to move to suppress and/or strike the identification were justified in light of the circumstances. Consequently, we reject this portion of respondent's argument.

B.    <u>Whether a Motion to Suppress Would Have Had Merit.</u>

In a second effort to justify the state court's ruling on petitioner's claim, respondent contends that even had trial counsel moved to suppress Mr. Fuller's in-court identification, such a motion would not have had merit. On this point, it offers two separate arguments. First, it claims that, considering the conflicting testimony of Mr. Fuller and Detective Piree, the photo array itself was not suggestive and, thus, not a ground for a motion to suppress. Second, it asserts that even if the photo array could be deemed suggestive, Mr. Fuller's in-court identification was the untainted product of an independent source. Again, we take each of these points in turn.

1.    <u>Suggestivity of the Photo Array</u>

The Due Process Clause prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." <u>Stovall v. Denno</u>, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967).  In <u>Simmons v. United States</u>, 390 U.S. 377, 88 S. Ct. 961 (1968), the United States Supreme Court recognized that the "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." <u>Id</u>. at 383 88 S. Ct. at 971.  If police single out particular photographs or indicate that they have evidence implicating one of the individuals in the photographs, the chance of misidentification is heightened, thereafter reducing the trustworthiness of a subsequent lineup or in-court identification. <u>Id</u>. at 383-384.  In other words, the Court theorized that a witness, upon being subjected to a suggestive photo array, may retain the image of the suggested perpetrator in his or her mind, making any later identifications potentially inaccurate. <u>Id</u>.

Despite its acknowledgment of the hazards inherent in initial identification by photograph, however, the Supreme Court declined to blanketly prohibit its employment as unconstitutional. <u>Id</u>. at 384.  Rather, it held that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the

20

photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id. at 384.

During the preliminary hearing, in the case at bar, Mr. Fuller indicated that the photo array conducted by Detective Piree was unduly suggestive. Specifically, he explained that Piree handed him a stack of approximately 100 photographs and told him to go through them. (N.T. 3/25/93, at pp. 24-25). Subsequently, Piree picked out two of the photographs, those of petitioner and his co-defendant, and told him to look at them "real good." Id. Piree then asked, "Do you think these are the two, I don't want to press it on you." Id. at p. 25. Fuller then indicated that they were the closest that came to describing the shooters he saw. Id. Prior to Detective Piree pointing out these photographs, Fuller had not noticed them. Id. at pp. 28-29. Later during the preliminary hearing, Mr. Fuller reiterated that had Detective Piree not picked out any of the photographs from the pile, he would not have identified anyone. Id. at 44. During trial, after having made an in-court identification of petitioner, Mr. Fuller again reaffirmed his version of events, indicating again that Detective Piree selected the photos for him and that he would not have otherwise identified petitioner as the culprit. (N.T. 5/25/94, pp. 137-146).

Mr. Fuller's testimony, however, was contradicted by that of Detective Piree. Detective Piree testified at trial that Mr.

Fuller had viewed photographs on three different occasions and did not identify anyone during either of the first two.  During the third array, however, Mr. Fuller was shown 24 photographs, including those of petitioner and Shaurn Thomas.  This array was the identical one given to Christopher Young a short time prior. According to Detective Piree, Mr. Fuller identified petitioner and Shaurn Thomas as perpetrators and stated, "I believe it is them." The detective explicitly denied Fuller's allegation that two photographs were singled out.  (N.T. 5/25/94, 216-220, 223).

In light of this conflicting testimony, the Commonwealth now contends that a motion to suppress would not have had merit since the suggestive nature of the photo array remains disputed. This argument, however, turns on a credibility determination. Although such findings should normally be made at the state level, neither the trial court nor the PCRA court either had or took the opportunity to hear from these two witnesses.  This Court made an effort to develop the record, by way of an evidentiary hearing, but these efforts were fruitless.  While respondent produced both witnesses on September 10, 2003, petitioner was mistakenly not brought into court by the imprisoning authority.  Petitioner's counsel declined to waive his appearance and allow the hearing to proceed that day.  Rather than postponing the hearing to a different date, as was proposed by the Court, both counsel for respondent and petitioner agreed to rest on the record as already

developed.

Such events leave this Court in somewhat of a conundrum. While we must decide the crucial question of whether the photo array shown to Mr. Fuller was suggestive, and thus tainted his in-court identification, we have only the starkly conflicting testimony of Mr. Fuller and Detective Piree on which to base this determination. To resolve our dilemma, we turn to the operating burdens of proof. We recognize that petitioner bears the burden of proving his entitlement to the writ of habeas corpus. He need only show, however, that his counsel's actions were below the norm of professionally reasonable assistance. As he has already done so, we must now inquire into what the result would have been had counsel, in light of the record as it now stands, made such a motion at the state trial level. Pursuant to Pa. R. Crim. P. 581(H), "[t]he Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of defendant's rights." As such, the Commonwealth carries both the burden of production and persuasion of establishing by a preponderance of the evidence that the photo array was not improperly suggestive. See Commonwealth v. Culp, 548 A.2d 578, 581 (Pa. Super. 1988).

As this Court has heard neither the testimony of Detective Piree nor the testimony of Mr. Fuller, we cannot assign any credibility ratings to either of them. Their versions of

events stand in direct contradiction of one another. The Commonwealth, however, retains the burden of persuasion to prove, by a preponderance of the evidence, that Detective Piree's version of the story is accurate. It has not done so. Consequently, we must accept petitioner's position and deem the out-of-court identification improper.

> 2. Mr. Fuller's Identification as the Product of an Independent Source

Respondent next claims that, even assuming the photo array was impermissibly suggestive, Mr. Fuller's identification constituted the product of an independent source. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977). If, following a suppression hearing, a trial court finds that out-of-court identifications were impermissibly suggestive, it may also exclude the in-court identification, unless an independent basis for that in-court identification exists. DiAngelo v. U.S., 406 F. Supp. 880, 882 (D.C. Pa. 1976), aff'd, 566 F.2d 1168 (1977). In United States v. Higgins, 458 F.2d 461 (3d Cir. 1972), the Third Circuit Court of Appeals set out seven factors to be considered in making this determination:

> (1) the manner in which the pre-trial identification was conducted;
>
> (2) the witness' prior opportunity to observe the alleged criminal act;

(3) the existence of any discrepancies between the defendant's actual description and any description given by the witness before the photographic identification;

(4) any previous identification by the witness of some other person;

(5) any previous identification of the defendant himself;

(6) failure to identify the defendant on a prior occasion; and

(7) the lapse of time between the alleged act and the out-of-court identification.

458 F.2d at 465. Although each individual factor is important, the "totality of surrounding circumstances" governs the ultimate determination. Id. Again, "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification. Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 31 (1972).

Our task at hand, then, mandates that we assess the case at bar under each of these individual factors, with a mind towards ultimately determining whether Mr. Fuller's in-court identification was made from his own independent recollection. The first factor, the manner in which the pre-trial identification was conducted, clearly weighs in favor of petitioner. As we concluded above, the identification was unduly suggestive in that Detective Piree singled out the photographs of petitioner and his co-defendant.

To assess the second factor, the witness's prior opportunity to observe the event, we turn to the state court record. Mr. Fuller testified, at the preliminary hearing that, at the time of the crime, he was focused on his chess game with bar

25

owner Harry James when a man came in and pulled out a pistol. (N.T. 3/25/93, at pp. 8-9). He explained that the house was dim and his back was towards the door. (N.T. 3/25/93, at p. 10, 24). At that point, the man that pulled the gun was maybe two and a half feet away from him. Mr. Fuller was not really paying attention, but rather remained focused on his chess game. Id. at 10-11, 46. Harry James then jumped out of his chair, grabbed the gun and Mr. Fuller heard a shot. Id. at 11. Immediately afterwards, he hit the floor and indicated that he was in a panic state. Id. at 11-12. Mr. Fuller then testified that he jumped up and ran to the kitchen door only to find that it was barricaded, so he started back toward the front door. Id. at 12-13. On his way back, the man with the gun saw Fuller and Fuller saw him as they stood approximately seven or eight feet apart. Id. at 14-15. When asked if they were facing each other, Fuller testified, "Yes, I was facing him, but you know it was just – it happened so fast." Id. at 14. The man said, "[y]ou want some too," fired at Fuller, Fuller ducked and the bullet hit him in the right shoulder. Id. at 15.

Mr. Fuller likewise testified at trial regarding his opportunity to observe the shooting. He repeated that he was not paying attention to what was going on at the front door since he was focused on his chess game. (N.T. 5/25/94, at p. 119). As a result, he did not see the shooter come in initially. Id. at 120.

26

He again related the details of that night, but could not be sure
whether the shooter went through James's pockets or whether there
was another person there.  Id. at 123-124.

Considering the totality of this testimony, we find that
Mr. Fuller did have an opportunity to observe the shooter, albeit
not the best opportunity.  For much of the crime, Mr. Fuller was
either concentrating on his chess game, on the floor, in the
kitchen or lying on the ground with a bullet in his shoulder.
During the moments that Fuller and the shooter were facing each
other, Fuller indicated that "it happened so fast" or that he was
in a state of panic.  (N.T. 3/25/93 at pp. 11-12, 14).  Hence, this
factor, while not weighing against the Commonwealth, does not
decidedly advocate in favor of its case either.

Turning to the third factor, the record does not evidence
any discrepancies between Mr. Fuller's description of the shooter
on the night of the crime and petitioner's actual appearance.
During the preliminary hearing, Mr. Fuller indicated that he had
described the shooter to the police as a very dark and rough-
skinned man, standing about five seven or five eight and who was
approximately 39 or 40 years of age.  (N.T. 3/25/93, at p. 27).
Likewise, in his statement to police on the night of the crime,
plaintiff gave the following description:

> He was dark skinned, thin about 5'7" to 5'8" tall, his
> face had rough skin.  It was more like chicken po[x] but
> I just thought he had bad skin.  He had on a light weight
> navy blue jacket about the same length as mine.  He had

27

on Wranglers.   I didn't notice his shoes.   He wasn't wearing a hat.  His hair was close cut.  I don't think he had mixed gray hair.  About 38 years old he looked to be.

Respondent's Memorandum of Law, at Exhibit B.

Undoubtedly, this description closely matched that of petitioner's.  As pointed out by respondent, petitioner, at the time of arrest, was 42 years old, 142 pounds and 5'7".  His hair was closely cut, his skin tone was dark and his skin condition was rough or "bad."   The absence of any discrepancies between description and actual appearance lends support to respondent's claim.

The fourth factor – any previous identification by Mr. Fuller of some other person – has little bearing on the matter before us.  Mr. Fuller was shown hundreds of photographs by police, but did not identify anyone else as the shooter.

The fifth and sixth factors concern any previous identifications of defendant or failures to identify defendant. Other than during the improperly suggestive photo array and trial, Mr. Fuller never made any other identifications of petitioner. Indeed, quite the opposite occurred.  At the preliminary hearing, a mere four months after the incident in question, Mr. Fuller was questioned regarding the events on the night of the crime. Thereafter, the following exchange occurred:

Q:   Did you see anybody that was there that night that's in the room today?

A:   I am not really sure.  I can't be positive.  I

28

                 can't be positively sure.

MR. TINARI:       Objection.

Q:   You can't be positively sure, what do you mean –

THE COURT:        Let the record reflect that the witness
                  took 25 seconds to look at the defendants
                  at the defense table.  What do you mean
                  you're not sure.

A:   I mean that the gentleman sitting over there, he
     could be the one.  I am not sure.

THE COURT:        Which one, what is he wearing if you
                  could tell us?

A:   He's wearing a blue and black sweater.

MR. MIRARCHI:  Indicating Clayton Thomas.

THE COURT:        He would be the one, you're not sure.

A.   I am not sure.

THE COURT:        That's fair enough.

(N.T. 3/25/93, at pp. 16-17).  Ultimately, Mr. Fuller failed to

inculpate petitioner as the shooter until over one year later at

trial.  (N.T. 5/25/94, at pp. 129-30).[5]

        Finally, under the last factor, the record does not

reflect a specific date on which the out-of court identification

occurred.  We do know, however, that it took place sometime between

the December 1992 shooting and the March 25, 1993 preliminary

---

        [5] When cross-examined as to this discrepancy, Mr. Fuller explained that,
"[f]irst of all, I was very nervous and it was kind of – I felt as though it
was kind of unfair for me, because I never testified or anything like this
before and it was kind of unfair to me.  I felt as though I was put under a
lot of pressure."  Id. at 134.  This testimony, however, does not explain why
Mr. Fuller, once nervous while on the stand, was able to gain confidence
during trial and suddenly identify the petitioner.

hearing, thus meaning that the identification occurred within, at most, a few months of the crime.  His subsequent failure to identify occurred on March 25, 1993.  Finally, the in-court identification occurred on May 25, 1994, approximately a year and a half after the shooting.

Individually, the above factors weigh partially in favor of petitioner's claim and partially in favor of respondent's argument.  Considering them in conjunction, however, we simply cannot be confident that Mr. Fuller's identification was the product of an independent source.  While we recognize that he had the opportunity to see the shooter and ultimately managed to identify Clayton Thomas as the culprit, we question the conviction with which that identification was made.  Repeatedly, Mr. Fuller emphasized that, during the crime, he was focused on his chess game, that he was upset and panicked, that things were moving quickly and that he dropped to the floor.  Mr. Fuller provided a good description of the shooter subsequent to trial, yet, at a photo spread shortly thereafter, he was unable to pick out petitioner's photograph until Detective Piree singled it out.  Even at that time, Mr. Fuller stated not that petitioner was definitely the shooter, but only that his photo came the closest.  At the preliminary hearing, when confronted with petitioner face-to-face, Mr. Fuller took a close look at him, but simply could not be positive that it was him.  Fourteen months later, however, and only

after having viewed petitioner's photograph and having seen petitioner at the preliminary hearing, Mr. Fuller was suddenly certain that petitioner was the shooter. These circumstances give rise to "the very substantial likelihood of irreparable misidentification" cautioned against by the Supreme Court in Simmons, supra. Indeed, we find it quite likely that the in-court identification was significantly swayed by Mr. Fuller's pre-trial exposure to petitioner's photograph. As such, we cannot agree with the Commonwealth that Mr. Fuller's in-court identification was the product of an independent source.

C.   Whether Petitioner Suffered Prejudice.

In its final effort to undermine petitioner's claim, respondent asserts that, assuming *arguendo* petitioner could meet the first prong of the Strickland test, he fails to establish prejudice under the second prong. Specifically, it claims that eyewitness Christopher Young also identified petitioner as the shooter, thereby making Mr. Fuller's testimony merely cumulative.

As we stated in our previous Report and Recommendation, however, we find respondent's arguments unconvincing. The remainder of the Commonwealth's case against petitioner consisted of the testimony of Christopher Young. At trial, Young identified petitioner as the shooter approximately five times. (N.T. 5/25/94, at pp. 65, 80, 82, 89, 91). His testimony, however, was far from credible. At the outset, Young failed to implicate petitioner,

31

forcing the Commonwealth to introduce his prior inconsistent statement to police that petitioner and his son Shaurn were the perpetrators. Id. at 20-21, 34-35. Moreover, on both direct and cross-examination, Young indicated that he was scared of the police and thought he was going to be locked up for the murder. Id. at 92. Indeed, he stated that the police threatened that he would "go down" or be arrested for the murder if he did not talk and name the murderer. Id. at 29-30, 39-40. In addition, Young had given multiple, varying statements to police. Id. at 69-71. While he could not identify petitioner in his first statement, he was able to do so in the second statement. To explain this inconsistency, Young testified that, during the photo array after his first statement, the detective stated, "[i]f you don't tell me if this man [indicating petitioner] and Shaurn killed Harry, you are going down for the murder." Id. at 96. Finally, Young implied, on cross-examination, that he too was subject to a suggestive photo array. He stated that when initially given a stack of photographs by Detective Piree, he could not identify anyone. Id. at 99. Subsequently, the detective pulled two pictures out of the stack and asked, "[a]ren't these the two men?" thereby tainting any ensuing identification. Id.

Certainly, these circumstances did not lend a great deal of credibility to Young's account of the crime. He changed his story repeatedly and, only when badgered about these

inconsistencies, did he positively identify petitioner. Moreover, he indicated an obvious motive to lie – fear that if he did not implicate petitioner, he was going to be charged with the crime. Finally, his photo array bore the same tinge of suggestivity as that of Mr. Fuller's. Had this testimony stood on its own, as the sole implication of petitioner without the corroboration of Mr. Fuller, we cannot say, with confidence, that petitioner would have been convicted. Indeed, we find a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different. As this finding is sufficient to establish prejudice, we must deem the second prong of <u>Strickland</u> satisfied.

IV.  CONCLUSION

Notwithstanding the vigorous and well-articulated arguments by respondents, this Court finds grounds warranting the grant of the writ of habeas corpus. Petitioner adequately proved that counsel's conduct fell outside the bounds of reasonably professional conduct. Further, he established that a motion to suppress would have indeed had merit and resulted in the suppression of Mr. Fuller's in-court identification. Finally, based on the record before us, the failures of counsel undermine our confidence in the outcome of the trial. Consequently, we recommend that the petition before us be granted and that

petitioner be given a new trial within ninety days.[6]

Therefore, I make the following:


RECOMMENDATION

AND NOW, this                day of *September*, 2003, IT
IS RESPECTFULLY RECOMMENDED that the Petition for Writ of Habeas
Corpus be GRANTED and that petitioner be given a new trial within
one hundred and twenty (120) days from the date this Recommendation
is approved.  There exists probable cause to issue a certificate of
appealability.



_____
CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

---

[6] For the reasons set forth at length in our Memorandum and Order dated
June 10, 2003, we recommend that the petitioner's remaining habeas claims be
dismissed on their merits.