IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLAYTON THOMAS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BEN VARNER, et al. | : | NO. 02-4778 |

## RESPONDENTS' OBJECTIONS TO MAGISTRATE'S REPORT AND

## RECOMMENDATION AND SUPPORTING MEMORANDUM OF LAW

**LYNNE ABRAHAM**, District Attorney of Philadelphia County, by **HELEN KANE**, Assistant District Attorney, and **THOMAS W. DOLGENOS**, Chief, Federal Litigation, on behalf of respondents, respectfully objects to the Report and Recommendation of the Honorable Charles B. Smith dated September 29, 2003, recommending that the writ of habeas corpus be granted on the single claim that trial counsel was ineffective for not moving to suppress and/or strike the identification testimony of Peter Fuller and denying the writ with respect to petitioner's remaining claims and, in support thereof, states:

### INTRODUCTION

Petitioner was convicted in 1994 of second degree murder and related crimes by a jury. After seeking direct and collateral review in state court without success, petitioner filed the instant petition for writ of habeas corpus. The case was referred to the Honorable Charles B. Smith who, after the filing of the Commonwealth's response, issued a preliminary Report and Recommendation on June 10, 2003. Magistrate Smith denied all of petitioner's claims except one and ordered an evidentiary hearing to explore whether trial counsel was ineffective for not litigating a motion to suppress the identification testimony of eyewitness and shooting victim, Peter Fuller. On September 29, 2003, following two hearings, the Magistrate issued a final Report and

Recommendation recommending that the writ be granted with respect to the claim that trial counsel was ineffective concerning the identification testimony of Mr. Fuller.  The Commonwealth objects as follows to the Magistrate's Report and Recommendation.

**(1)  The Magistrate ignored the mandated presumption of correctness; he should have deferred to the state court's factual finding that trial counsel's challenged conduct was strategically based.**

Because Mr. Fuller -- who did not identify petitioner at the preliminary hearing -- did positively identify petitioner at trial, petitioner claimed that trial counsel was ineffective because he did not either attempt to renew the suppression motion that he had withdrawn or move to strike Mr. Fuller's identification after it occurred at trial.

Based on the trial record, the state court rejected petitioner's ineffectiveness claim concerning Mr. Fuller, because defense counsel's choice not to renew his suppression motion was part of an objectively reasonable trial strategy.  The state court noted that counsel extensively cross-examined of Mr. Fuller as to his change of testimony and also elicited Mr. Fuller's testimony that his photographic identification had been influenced by the detective who allegedly showed him petitioner's photograph prior to the witness' identification.  This was an important part of the defense theory of the case -- that the evidence against petitioner was the result of lies and overzealous police work.  The prosecution sharply disputed this version of events -- at trial, Detective Jeffrey Piree denied that he had pointed out petitioner's photograph prior to Mr. Fuller's identification of petitioner (N.T. 5/25/93, 220).

The habeas statute mandates that a state court's factual finding is presumed correct.  28 U.S.C. § 2254(e)(1).  Under <u>Berryman v. Morton</u>, 100 F.3d 1089 (1996), a state court's finding that trial counsel has a particular strategy is a factual finding to

which the presumption of correctness applies.  Contrary to Section 2254(e)(1) which requires the habeas petitioner to rebut the correctness of any state court factual finding with clear and convincing evidence,  the Magistrate imposed no burden on petitioner here but simply rejected the state court's factual finding concerning trial counsel's strategy.  He gave no reason for this rejection, other than the Magistrate's belief that the state court record was incomplete and therefore decided that the state court was remiss for not holding an evidentiary hearing on petitioner's claim.  The Magistrate's rejection of the state court's reasonable determination that it could adjudicate petitioner's claim based on the record before it was itself unreasonable.  For example, the Magistrate did not indicate why trial counsel's contemporaneous statements concerning his trial strategy as outlined in his opening and closing statements --  which his actions at trial confirmed -- were insufficient "proof" to support the state court's factual finding that (a) trial counsel had a strategy with respect to Mr. Fuller and (b) it was objectively reasonable.<1>  Thus, the Magistrate's rejection of the state court's factual finding that counsel had a strategy with regard to Mr. Fuller was error.   The Commonwealth discusses this objection to the Magistrate's Report and Recommendation at pp. 16-21 of the accompanying Memorandum of Law.

**(2) The Magistrate failed to review petitioner's claim of ineffective assistance under AEDPA's deferential standard of  review and instead reviewed the claim de novo.**

Having thus improperly rejected the state court's conclusion that trial counsel had an objectively reasonable strategy, the Magistrate next erred in reviewing petitioner's claim of ineffective assistance under a de novo standard of review rather than applying the deferential standard of review mandated under the Anti-Terrorism and Effective

Death Penalty Act (AEDPA).  Under AEDPA, a federal court may not grant relief unless the state court's decision was contrary to or an unreasonable application of controlling United States Supreme Court precedent.  Here, the Magistrate's grant of relief was based solely on his disagreement with the state court's finding that trial counsel's actions here were objectively reasonable.  The Commonwealth has addressed this objection to the Magistrate Report and Recommendation at pp. 21-24 of the accompanying Memorandum of Law.

(3)     **The Magistrate misapplied _Strickland_ in reviewing        petitioner's ineffectiveness claim.**

In addition, the Magistrate's finding that trial counsel was ineffective here was based on a misapplication of _Strickland v. Washington_, 466 U.S. 688 (1984), the law governing claims of ineffective assistance of counsel. The Commonwealth has addressed this objection to the Magistrate's Report and Recommendation at pp. 24-38 of the accompanying Memorandum of Law.

(4)     **In resolving the underlying suppression claim, the        Magistrate erroneously placed the burden of proof on the   respondents rather than the habeas petitioner, in violation of        Third Circuit precedent.  In addition, the Magistrate erred in        applying the "totality of the circumstances" test to the challenged identification procedure.**

Perhaps most troubling of all, the Magistrate transformed the habeas corpus proceeding into a suppression hearing and in violation of Third Circuit precedent, erroneously re-allocated the burdens of persuasion and production from the habeas petitioner to the Commonwealth and required the Commonwealth to prove by clear and convincing evidence that the photographic identification procedure was not unduly suggestive.  Contrary to the Magistrate's ruling here, the Third Circuit has held that a habeas petitioner challenging the effectiveness of his counsel for not moving to suppress an identification has the burden of proving that the identification procedure was suggestive.  _Reese v. Fulcomer_, 946 F.2d 247, 259 (1991).

The Magistrate also erred in concluding that the photographic identification was suggestive.  This finding was based on nothing more than a conflict in the state court testimony of Mr. Fuller and Detective Piree concerning the circumstances of the photographic identification.  The existence of a conflict of evidence, however, does not

mean that the identification must have been suggestive.   The Magistrate then considered whether Mr. Fuller's in-court identification was nevertheless admissible under the totality of the circumstances test of Neil v. Biggers, 409 U.S. 188 (1972) and Manson v. Brathwaite, 432 U.S. 98 (1977).  The Magistrate's application of this test was unlawful, because he considered the factors in isolation rather than as a whole, as Supreme Court precedent requires.  The Commonwealth addresses this objection to the Magistrate's Report and Recommendation at pp. 39-46 of the accompanying Memorandum of Law.

## PERTINENT FACTUAL AND PROCEDURAL HISTORY

Almost eleven years ago, on December 9, 1992, shortly after 1:30 a.m., petitioner and an accomplice who acted as lookout, robbed a North Philadelphia speakeasy and fatally shot Harry James, its proprietor.  Petitioner also shot Peter Fuller, a customer, who survived.  At approximately 3:00 a.m., after being treated for his gunshot wound, Mr. Fuller was taken to the Homicide Unit at the Philadelphia Police Administration Building.  At 3:50 a.m., Mr. Fuller gave a statement to Detective McGlotten in which he explained that he had been playing chess when a gunman came into the speakeasy and announced a hold-up.  Mr. Fuller looked up and saw Mr. Harry, struggling with the robber whom Mr. Fuller observed had a small gun that appeared to be a .38.  After the victim was shot the first time, Mr. Fuller got down on the floor and after the second gunshot, Mr. Fuller got up and ran into the kitchen, attempting to escape through the back door.  Finding the door locked, Mr. Fuller returned to the front room where he came face to face with the gunman who pointed the gun at his head and said something

like,"You want some too?" As Mr. Fuller dove to the floor, the robber fired again, striking Mr. Fuller in the shoulder.  The robber rifled through Mr. Harry's pockets and left (P.H.N.T. 3/25/93, 10-17).<2>

Mr. Fuller provided a detailed description of the man who shot him and killed Mr. Harry.  As the Magistrate Judge found, Mr. Fuller's description closely matched petitioner.  See Report and Recommendation dated 9/29/03, at 28.  For example, Mr. Fuller described the shooter as approximately 5'7" with a thin build.  Petitioner is 5'7" and when arrested, he weighed 142 pounds.  Mr. Fuller estimated the shooter's age as about 38 while   petitioner was 42 years old at the relevant time.  Mr. Fuller further described the shooter as a black male with a very dark skin tone and recalled that his face was pock-marked which details coincide with petitioner's actual appearance.  See Arrest Photo of Petitioner, Exhibit C (admitted at evidentiary hearing, 9/9/03).  Mr. Fuller also noticed that the shooter had very short hair as did petitioner and his description of the shooter's clothing matched information provided by Christopher Young, another eyewitness.       Immediately after the crime, eyewitness Christopher Young  also gave a statement to police.  Young, however, knew more about the crime than what he had just witnessed.  Indeed, he knew the perpetrators to be petitioner and his son Shaurn because, earlier that day, petitioner had asked Young if he would go along with them to rob the victim.  Young, who knew Shaurn because the two men were dating sisters, refused to participate in the robbery.  Young lived two doors away from the speakeasy, was a regular customer and often did chores for its owner who was known in the neighborhood as "Mr. Harry."  In his initial statement to police, however, Young did not admit that he knew who the robbers were.  Instead, he provided only scant

details about the crime and told the police only that he arrived at Mr. Harry's shortly before the shooting, that two "older" men had followed him into the speakeasy and he described the shooter as an older black man with dark skin wearing a dark blue short jacket and armed with a handgun (N.T. 5/25/93, 4, 6, 69-70, 72, 80, 95).  See also Young's statements, dated 12/9/92 and 1/18/93, admitted at trial collectively as Exhibit C-3 (N.T. 5/25/94, 33, 85, attached hereto).

At approximately 6:00 a.m., after completing his statement to police, Young called his girlfriend, Tera (Peaches) Jones and told her that "Blue" (petitioner's street name) had shot Mr. Harry and Pete (N.T. 5/24/92, 136, 166, 176).

A few weeks after the crime, Detective Jeffrey Piree, the assigned homicide investigator, took Mr. Fuller to the Homicide Unit to view a large number of photographs of black males previously arrested and/or convicted of robbery.<3>  Mr. Fuller did not identify any of the hundreds of photographs shown to him by an automatic display mechanism.   Petitioner's photograph was not among those shown to Mr. Fuller at this time (N.T. 5/25/94, 137, 216, 220-221).

On January 18, 1993, Detective Piree re-interviewed Young.  As a precaution, in the event that Young turned out to be a suspect in this crime, Detective Piree warned him of his constitutional rights prior to questioning him.  Young waived his rights and gave a second statement.  This time, Young admitted that he knew the robbers, a father and son, but he still did not reveal their real names, referring to petitioner as "Blue" or "Mr. Blue" and the son as "Shawn."  Young also revealed that "Blue" had attempted to recruit him to rob Mr. Harry's.  When "Blue" first proposed the crime to his son and Young, "Shawn" had protested that he was known at the speakeasy.  Young refused to

participate in the planned heist (N.T. 5/25/94, 170-171, 176-177).

Young further provided a description of the crime that exactly corroborated the statement of Peter Fuller's. Young explained that after he left "Blue" and "Shawn," he went to Mr. Harry's for a beer. A short time later, "Blue" and "Shawn" came to Mr. Harry's and Young saw each of them with a gun. When "Blue" announced the hold-up, Mr. Harry jumped him and "Blue" shot him twice with a revolver. "Blue" also shot Peter Fuller, a customer who had been playing chess with Mr. Harry when the hold-up was announced. Mr. Fuller attempted to escape through the kitchen but then returned to the front room where he came face to face with petitioner who shot him, wounding him in the shoulder as Mr. Fuller ducked. After going through Mr. Harry's pockets, "Blue" and Shawn ran out of the speakeasy and police were called to the scene (N.T. 5/25/94, 177-180).

Young also informed the detective that a few days after the crime, Shawn had called him and admitted committing the robbery with his father. Shawn told Young that it was stupid for them to have done so and wrong for his father to have killed Harry and shot Pete. Young also told Detective Piree that he had spoken to Mr. Harry's 14 year-old son, "Moncho," and told him that Shaurn's dad had shot Mr. Harry and Pete and that Shaurn was also there, armed with a shotgun. Finally, Young confirmed that he could identify "Blue" and Shawn if he saw their photographs (N.T. 5/25/94, 185-187).

On February 4, 1993, Detective Piree went to Young's house with two groups of 12 photographs, including petitioner's and his son, Shaurn Thomas. In the presence of Young's aunt and an older male relative, the detective showed Young the two photo arrays, in turn, and asked if Young recognized anyone from either array as having been

involved in the fatal robbery.  Young selected Shaurn's photograph from the first group and identified him as "the one who stood in the door with the shotgun."  He selected petitioner's photograph from the second array and identified him as "Blue," the man who had robbed and killed Mr. Harry and then shot Pete.  After leaving Young's house, Detective Piree went around the block to where Peter Fuller lived.  He showed Mr. Fuller the same two groups of 12 photographs that he had shown to Young.  Like Young, Mr. Fuller identified petitioner and Shaurn Thomas as the robbers (N.T. 5/25/94, 189, 190, 219).

Following their arrests, petitioner and Shaurn Thomas were held for court following a preliminary hearing on March 25, 1993.  At the preliminary hearing, Mr. Fuller testified about the circumstances of the crime and while he described the shooter in detail, he was unable to positively identify petitioner or the co-defendant at the hearing.  Mr. Fuller also testified that when Detective Piree showed him two groups of photographs at his home, the detective initially selected the photographs of petitioner and the co-defendant and then asked Fuller if he could identify them (P.H. N.T. 3/25/93, 7-16).

Christopher Young testified that shortly before the crime, petitioner had asked him and Shaurn to rob Mr. Harry's speakeasy with him but Young and Shaurn had refused.  Young then left his girlfriend's house (where the conversation with petitioner had occurred) and walked the short distance to Mr. Harry's speakeasy.  Young identified petitioner as the man who came into Mr. Harry's and ordered everyone to "get down." While lying on the floor, Young saw petitioner struggling with Mr. Harry.  Young heard a gunshot and then saw Mr. Harry "go down."  Young also testified that petitioner shot

Pete (P.H.N.T. 3/25/93, 54-63).    Although Young attempted to recant his prior statements implicating Shaurn as petitioner's accomplice, he agreed that the statement that he had given to Detective Piree on January 18, 1993 (in which he had named "Blue" and his son Shawn as the robbers), was an accurate recording of what he had told the detective (id. at 64).  In an attempt to explain his change of story with respect to Shaurn's involvement in this crime, Young testified that when he spoke to Detective Piree on January 18, 1993, he felt compelled to identify Shaurn as the accomplice because of pressure from Young's family and others in the neighborhood who were close to the victim and who believed that Shaurn was involved.  Young expressly denied that Detective Piree had pressured him to implicate Shaurn as petitioner's accomplice ( id. at 71).

Following the preliminary hearing, Charles Mirarchi, Esquire, counsel for petitioner, filed motions to suppress the photographic  identification and to sever the petitioner's case from the co-defendant, as well as a notice of alibi.  Mr. Mirarchi also filed a motion for the appointment of an investigator.  The court granted the motion for an investigator but denied the request for separate trials.  Jury selection commenced before the Honorable Jane Greenspan on May 23, 1994.  At that time, Mr. Mirarchi and Eugene Tinari, Esquire, counsel for Shaurn Thomas, withdrew the motions to suppress all photographic identifications that each had previously filed on behalf of their clients (N.T. 5/23/94, 2-3).

On May 24, 1994, petitioner and Shaurn Thomas were tried before Judge Greenspan and a jury.  At trial, Young identified petitioner as Mr. Blue and stated that he had seen petitioner and his son Shaurn, earlier on the day of the fatal robbery.  Initially,

Young attempted to recant his prior statements implicating both petitioner and Shaurn as the robbers.    Throughout the course of his trial testimony, however, Young "recanted" his attempted recantation and, as he did at the preliminary hearing and in his statements to Detective Piree on January 18, and February 4, 1993, Young identified petitioner as the man who shot and killed Mr. Harry and wounded Peter Fuller (N.T. 5/25/94, 80-82).    Indeed, although Young persisted in denying that Shaurn was involved, he identified petitioner as the shooter no less than 5 times in front of the jury (N.T. 5/25/94, 65, 80, 82, 89, 91).    Peter Fuller also testified about the circumstances of the crime and, for the first time, identified petitioner as the man who killed Mr. Harry and shot him (N.T. 5/25/94, 129).    When asked to explain how it was he was able to identify petitioner at trial when he had failed to do so at the preliminary hearing, Mr. Fuller explained that he was not sure when he saw petitioner at the preliminary hearing but he was now certain that petitioner was the shooter (N.T. 5/25/94, 131, 154).    Mr. Fuller also testified that he had not seen the second man and thus, was unable to identify Shaurn Thomas as having been involved in the crime (N.T. 5/25/94, 130)

On May 31, 1994, the jury found petitioner guilty of second degree murder, robbery, aggravated assault, and possessing an instrument of crime (Information Nos. 5255, 5258, 5260 and 5263, March Term, 1993).    The jury acquitted co-defendant Shaurn Thomas of all charges.    Judge Greenspan imposed the mandatory sentence of life imprisonment for second degree murder.

Petitioner appealed to the Superior Court of Pennsylvania which affirmed the judgment of sentence on May 5, 1998. Commonwealth v. Thomas, 718 A.2d 862  (Pa. Super. 1998).    Petitioner then filed a state collateral appeal under the Post Conviction

Relief Act, 42 Pa.C.S. § 9541 et seq., in which he raised at least 13 claims, some of which were divided into sub-claims. Judge Greenspan dismissed the petition without a hearing.<4>  The Superior Court affirmed the denial of post conviction relief on December 12, 2001. Commonwealth v. Clayton Thomas, No. 2134 EDA 2000. The state Supreme Court denied discretionary review.

Petitioner filed an application for a writ of habeas corpus. The matter was referred to Magistrate Judge Charles B. Smith who on June 10, 2003, denied relief on all but one of petitioner's claims and ordered an evidentiary hearing to explore whether counsel was ineffective for not moving to suppress and/or strike the identification testimony of shooting victim Peter Fuller based on the allegedly suggestive photographic display.<5>

On August 27, 2003, trial counsel for petitioner, Mr. Mirarchi and James Bruno, Esquire, who represented petitioner on direct appeal, each testified concerning his representation of petitioner. On September 9, 2003, the court re-convened to hear the testimony of Mr. Fuller and Detective Jeffrey Piree ostensibly to resolve to the Magistrate's satisfaction the discrepancy in their prior testimony with respect to the manner in which the photographic array of February 4, 1993 was conducted. These two witnesses were present but because petitioner was not transported from prison, the Court proposed to re-schedule the hearing when petitioner's counsel who initially had indicated that he would waive petitioner's presence, changed his mind. When the Commonwealth suggested that the Court could resolve the ineffectiveness claim based on the existing record with the addition of certain documents, petitioner's counsel agreed. The parties stipulated that the record be expanded to include the notes of

testimony from the preliminary hearing, the arrest photograph of petitioner taken on March 3, 1993, the written statements of Peter Fuller on December 12, 1992 and February 4, 1993 and the relevant pages of the voir dire transcript where Mr. Mirarchi and Mr. Tinari withdrew the previously filed motions to suppress the photographic identifications.    For the reasons which follow, the Commonwealth objects to the Magistrate's Report and Recommendation granting the writ of habeas corpus on the claim that trial counsel was ineffective with respect to the identification testimony of Mr. Fuller.

## **DISCUSSION**

**(1)  The Magistrate ignored the constraints of the habeas statute by failing to accord the presumption of correctness to the state court's factual finding that trial counsel's challenged conduct was strategically based.**

In reviewing the instant claim of ineffective assistance of counsel, the Magistrate failed to follow the constraints of the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, et seq (AEDPA), which governs the instant case.    AEDPA modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas "retrials" and to ensure that state court convictions are given effect to the extent possible under the law.    Bell v. Cone, 122 S.Ct. 1843, 1849 (2002). See also Calderon v. Coleman, 119 S.Ct. 500, 503 (1998) (AEDPA validates the "presumption of finality and legality" that attaches to a criminal conviction at the conclusion of direct review," quoting Brecht v. Abramson, 507 U.S. 619 (1993)).

Under AEDPA, a state court's factual findings are presumed to be correct and the statute assigns to the habeas petitioner the burden of rebutting the presumption of correctness by clear and convincing evidence.    28 U.S.C. § 2254(e)(1).    While the

Magistrate Judge acknowledged this provision of AEDPA, he failed to apply it.  For this reason, his grant of the writ must be reversed.

In Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996), the Third Circuit determined that a state court's finding that trial counsel acted in accordance with a trial strategy is a finding of fact.  Thus, under Berryman, the Superior Court's finding that trial counsel had strategy with respect to the identification testimony of Mr. Fuller, is presumed to be correct under § 2254(e)(1).  As the United States Supreme Court has made clear, the habeas statute's presumption of correctness accorded to factual findings by the state court applies without distinction to the factual findings of a state trial court and those of a state appellate court.  Sumner v. Mata, 449 U.S. 544, 548 (1981); Berryman, supra.  This presumption can be overcome only where the petitioner comes forward with clear and convincing evidence to the contrary.  Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002).

Here, in violation of § 2254(e)(1), the Magistrate imposed no burden on petitioner to overcome the state court's factual finding  concerning trial counsel's strategy but rejected it simply because the state court had not convened an evidentiary hearing in order to resolve this issue.  While the Magistrate Judge was of the opinion that, without having heard trial counsel testify concerning his trial strategy, the state court had to have merely speculated as to trial counsel's rationale for proceeding as he did at trial, the record refutes this view.  Indeed, the state court record fully supports the Superior Court's factual finding that trial counsel's decision to forgo the motion to suppress Mr. Fuller's testimony concerning the photographic identification was part of the overall defense strategy to create reasonable doubt by showing that the police had manipulated

the case against petitioner by coercing the witnesses and, specifically with regard to Mr. Fuller, unduly influencing him to identify petitioner's photograph as the shooter. Indeed, there was no question that, at least initially, trial counsel considered the tactic of seeking to suppress Mr. Fuller's photographic identification.  However, as the record shows, he withdrew the previously filed suppression motion (N.T. 5/23/94, 2-3).  Far from being forced to speculate as to trial counsel's rationale for withdrawing the suppression motion, the Superior Court could properly rely on the trial record itself, which included trial counsel's contemporaneous statements and showed that trial counsel actually conducted petitioner's defense exactly as he outlined to the jury.  For example, in his opening statement, trial counsel told the jury that it would hear how the police had improperly influenced Mr. Fuller in order to obtain a photo identification (N.T. 5/24/94, 110-112).   In view of trial counsel's stated intention to rely on Mr. Fuller's testimony concerning the manner in which he had identified petitioner's photograph, the Superior Court could properly conclude that trial counsel's decision not to go forward with the motion to suppress Mr Fuller's photographic identification was in keeping with trial counsel's announced strategy.  Indeed, moving to suppress the identification by Peter Fuller would have removed most of the testimony that supported the defense theory of over-reaching police conduct.  The Magistrate erred in refusing to consider trial counsel's contemporaneous statements outlining his trial strategy.

As trial counsel explained in his opening statement, Mr. Fuller's anticipated testimony about the photo array was an important part of the evidence which the defense contended established that the Commonwealth's case against petitioner was unreliable.   Thus, trial counsel told the jury that the police had threatened to charge

Christopher Young with this crime in order to force him to implicate petitioner and the co-defendant.  According to counsel, Young, the only other eyewitness, was the original source of what the defense claimed was false evidence against petitioner and thus it was crucial that the defense also undermine Young's anticipated testimony in order to create a reasonable doubt.  By eliciting Peter Fuller's testimony about the allegedly suggestive photographic identification, the defense could suggest that there was a pattern of police coercion here, not simply one isolated instance of coercion against Young.  Indeed, Young implicated petitioner to the same detective who had conducted the allegedly suggestive photo identification.  Having thus set forth a cohesive theory which, if accepted, might cause the jury to doubt all of the Commonwealth's evidence as tainted by outright police misconduct or, at the very least, overreaching, trial counsel then attempted to make good on his promise.

When the prosecutor, who had not referred to Mr. Fuller's photographic identification in his opening remarks, did not question Mr. Fuller about the subject on direct examination, trial counsel -- who had already told the jury that it would hear of the allegedly suggestive photo display -- brought up the subject on cross-examination and affirmatively elicited Mr. Fuller's testimony about the photographic identification (N.T. 5/25/94, 138-140).  During this cross-examination, trial counsel emphasized (1) the allegedly suggestive manner in which the detective conducted the array and (2) Mr. Fuller's opinion that he would not have identified petitioner's photograph on February 4, 1993, if the detective had not called his attention to it and asked if he was one of the robbers.<6>

Again in his closing argument, trial counsel emphasized the allegedly suggestive

manner in which Mr. Fuller had described the photographic identification.  Trial counsel

even reminded the jurors that he had promised them in his opening remarks that they

would hear that the detective had influenced Mr. Fuller's photo identification (N.T.

5/26/94, 69).  Thus, he argued:

> What did I say in my opening when I ripped
> the piece of paper and I put it out in front of
> you. Did I keep my word? Did I say this was going
> to happen? Did I say the detective shows [Mr.Fuller]
> the two [photos] and says aren't they and he says
>
> they look the most like it....

(N.T. 5/26/94, 70).

The state court was not required to convene an evidentiary hearing to explore

something that was readily apparent.  Because trial counsel's arguments as well as his

actions as reflected in the trial record fully supported the Superior Court's finding that he

had a specific strategy with regard to Mr. Fuller's photographic identification, its finding

that trial counsel elected to affirmatively use Mr. Fuller's testimony concerning the

allegedly suggestive circumstances which led to his identification of petitioner's

photograph as part of his overall strategy to discredit all of the Commonwealth's proof

against petitioner by showing that it was coerced and/or manipulated by the police is

presumed to be correct.  Because the Magistrate erroneously rejected the state court's

factual finding based on no evidence at all, let alone the clear and convincing proof

required by Section 2254(e)(1), the grant the writ must be reversed.

**(2)    The Magistrate failed to review petitioner's claim of ineffective
assistance under AEDPA's deferential standard of review and instead reviewed
the claim de novo.**

The Magistrate further erred in concluding that the state court's rejection of this

claim of ineffective assistance was an "unreasonable application" of <u>Strickland</u> because, in his view, the state court record was incomplete.

Under AEDPA, a federal court may **not** overturn a state court's resolution of the merits of a constitutional issue **unless** (1) the state decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state decision was based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(1), (d)(2). In <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495 (2000), the United States Supreme Court held that § 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in the state court." 120 S.Ct. at 1523. That is, the writ may issue only under two narrow circumstances - defined by the "contrary to" clause and the "unreasonable application" clause - both of which require more than a mere finding that the state court's decision is incorrect. <u>Id</u>. at 1520, 1523. In assessing the state court's ruling under AEDPA, the federal court must give the state court the benefit of the doubt and must defer to the strong presumption that the state court knows and follows the law. <u>Woodford v. Visciotti</u>, 123 S.Ct. 357 (2002) (readiness on part of federal court to attribute error to state court is inconsistent with the presumption that state court knows and follows the law). As the Supreme Court recently observed, the "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable. <u>Lockyer v. Andrade</u>, 123 S.Ct 1166, at 1174 (internal citations omitted).

Here, the Magistrate Judge concluded that the state court's resolution of petitioner's ineffectiveness claim was an unreasonable application of federal law because, in the Magistrate's view, the state court's decision was based on what the Magistrate deemed to be an incomplete record.  Report and Recommendation at 8, 10.  As discussed above, the state record was sufficiently complete to allow the Superior Court to review petitioner's ineffectiveness claim.  The state court's decision to rely on trial counsel's contemporaneous statements and the manner in which he actually proceeded at trial was not unreasonable.  There is no United States Supreme Court precedent which mandates that a reviewing court is required to conduct an evidentiary hearing in every case where a criminal defendant alleges that his former counsel is ineffective.  Nor does <u>Marshall v. Hendricks</u>, 307 F.3d 36, 115 (3d Cir. 2002), cited by the Magistrate Judge, compel a hearing in every instance.   Rather, the Court's observation in <u>Marshall</u>, that the resolution of a claim of ineffective assistance must be based on "facts of record" rather than assumptions concerning trial counsel's thought process has no bearing here where the state court record itself provided ample evidence of trial counsel's strategic choices.  Because the state court's resolution of this ineffectiveness claim was indeed based upon facts of record, its decision was not objectively unreasonable.   As the record of the instant habeas proceeding demonstrates, the Magistrate simply disagreed with the state court's conclusion that the trial record was sufficient to review the claims presented in petitioner's post-conviction appeal.   The Magistrate, however, has not suggested why trial counsel's contemporaneous comments which were borne out by the way he actually conducted petitioner's defense with regard to the challenged strategy are insufficient.   Under

AEDPA, a federal court's disagreement with the state court's determination is not a basis for finding that the state court's decision was "unreasonable."  Here, the state court's conclusion that trial counsel's strategy with respect to Mr. Fuller was apparent from the trial record was reasonable and the Magistrate's contrary, unsubstantiated finding must be reversed.

   **(3)  The Magistrate misapplied <u>Strickland</u> in finding that   trial counsel was ineffective.**

   To the extent that the Magistrate engaged in <u>de novo</u> review of petitioner's claim of ineffective assistance, he misapplied federal standards in finding that trial counsel was ineffective for not moving to suppress and/or strike the identification testimony of Peter Fuller.

   The "clearly established federal law" governing claims of ineffective assistance of counsel is found in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984).  <u>Bell v. Cone</u>, 122 S.Ct. 1843, 1851 (2002).

   Under <u>Strickland</u>, judicial scrutiny of a counsel's performance must be highly deferential and the reviewing court is required to make every to effort to eliminate the distorting effects of hindsight, reconstruct the circumstances of counsel's challenged conduct, and consider counsel's perspective at the relevant time.  466 U.S. at 689.  Thus, in every instance, <u>Strickland</u> necessarily requires that a defendant must overcome the presumption that counsel's challenged conduct "might be considered sound trial strategy."  Given this presumption, a defendant must prove that counsel's conduct was so unreasonable that no competent lawyer would have followed it, and that counsel has made errors so serious that counsel was not functioning as 'counsel' guaranteed ... by

the Sixth Amendment." Strickland, 466 U.S. at 687.

In addition, petitioner must prove prejudice, that "counsel's errors were so serious as to deprive [the petitioner] of a fair trial whose result is reliable." Id. In other words, a petitioner must demonstrate a reasonable probability that, but for counsel's professional dereliction, "the result of the proceeding would have been different." Id., at 694. This determination also assumes, absent grounds to the contrary, "that the judge or jury acted according to law." Id. Furthermore, such determination must be made in light of "the totality of the evidence before the judge or jury." Id., at 695.

Strickland therefore imposes a "highly demanding" standard upon a petitioner to prove the "gross incompetence" of his counsel. Kimmelman v. Morrison, 477 U.S. 365, 382 (1986). Consequently, it is only the "rare claim" of ineffectiveness that should succeed. Strickland, 466 U.S. at 689-90. Under Strickland, attorney performance is judged by an objective standard of reasonableness, "viewed to the extent possible from the attorney's perspective at the time, without 'the distorting effects of hindsight.'" Duncan v. Morton, (3d Cir. 2001), quoting Strickland, 466 U.S. at 688-90 Here, the Magistrate has ignored the realities confronting counsel at the time of trial and instead, relying on hindsight, he focuses almost entirely on the fact that Fuller identified petitioner at trial, and thus concludes that trial counsel was ineffective. In addition, the Magistrate seizes upon trial counsel's testimony at the habeas hearing that he was "surprised" when Peter Fuller identified petitioner at trial as "proof" that counsel was ineffective. Inexplicably, the Magistrate has ignored that the reason that trial counsel (along with the prosecutor) was surprised when Mr. Fuller identified petitioner at trial was because Mr. Fuller did not identify petitioner at the preliminary hearing, a

proceeding which is traditionally viewed as inherently suggestive.  Moore v. Illinois, 98 S.Ct. 458 (1977).  Trial counsel's surprise here was not caused by a lack of preparation or investigation -- it was due to the change in Mr. Fuller's testimony, a change that the record shows, trial counsel had no reason to anticipate.

Mr. Mirarchi testified at the August 27, 2003 evidentiary hearing that although he did not have a detailed recollection of his representation of petitioner nine years earlier, he withdrew the motion to suppress because he did not expect that Mr. Fuller would identify petitioner at trial in light of his failure to identify him at the preliminary hearing. Trial counsel's expectation with regard to Mr. Fuller was completely reasonable given his failure prior to identify petitioner.  Having witnessed Mr. Fuller hesitate and ultimately fail to identify petitioner at the preliminary hearing -- an inherently suggestive one on one confrontation between the victim and accused  -- trial counsel could reasonably expect that when the trial occurred, Mr. Fuller would, consistent with his preliminary hearing performance, again decline to identify petitioner.

Moreover, prior to trial --  the point at which a motion to suppress ordinarily would have been litigated --  there was no in-court identification by Mr. Fuller to be suppressed.  Indeed, the only identification by Mr. Fuller had occurred at the allegedly suggestive photographic display.  However, as Mr. Fuller's account of this incident figured prominently in the defense, there was no reason for trial counsel to move to suppress the photographic identification.

Nevertheless, the Magistrate faults trial counsel for not taking anticipatory measures to guard against any possibility that Mr. Fuller might be able to identify petitioner at trial.  Thus, the Magistrate observes that "[o]nce the prosecution revealed"

that it planned to call Mr. Fuller at trial, Mr. Mirarchi made no additional efforts to ascertain (through some unspecified means of discovery) whether or not Mr. Fuller would be able to identify petitioner.[7]   What the Magistrate fails to appreciate, however, is that there was never was any doubt that Mr. Fuller -- a shooting victim and eyewitness to a fatal robbery -- would testify as a Commonwealth witness at trial.  That he had failed to identify petitioner or the co-defendant at the preliminary hearing by no means eliminated him from the potential witnesses that the Commonwealth would call to prove its case.   Furthermore, having cross-examined Mr. Fuller at the preliminary hearing -- with a measure of success -- Mr. Mirarchi had no reason to anticipate that Mr. Fuller's testimony would, with the passage of time, become stronger for the Commonwealth.  Thus, the fact that the Commonwealth was going to call Mr. Fuller at trial would not have raised any potential red flags requiring that counsel undertake additional investigation to confirm that there had been no change in the witness' testimony.

Moreover, as a practical matter, the only way to explore whether Mr. Fuller would identify petitioner at trial was to provide Mr. Fuller with yet another opportunity to see petitioner pre-trial.  An additional confrontation between the victim and petitioner might have led to Mr. Fuller's identification of petitioner and thus strengthened the Commonwealth's case against him.  Even if Mr. Fuller did not identify petitioner at another pre-trial confrontation, the additional viewing might well have enhanced his ability to recognize him later at trial.  Strickland does not require that trial counsel pursue a course that potentially could be detrimental to his client. Based on his extensive cross-examination of Mr. Fuller at the preliminary hearing, trial counsel was prepared to

confront this witness effectively at trial.

The Magistrate's additional finding that trial counsel was ineffective for not moving after-the-fact to suppress and/or strike the in-court identification by Fuller once it occurred at trial fails to consider the realities of a criminal trial as well as the limited potential for success of the proposed strategy.  In the first place, a motion to suppress evidence must be made pretrial, unless the opportunity did not previously exist, or the interests of justice otherwise require that it be heard at some later time.  See Pa.R.Crim.Pro. 581(B) (former rule 323).  The Magistrate's conclusion that petitioner could meet both criteria, is simply not borne out by the facts.  There is no question that petitioner knew of the allegedly suggestive photographic identification as of the preliminary hearing on March 25, 1993.  Thus, he could not possibly show that he did not have the opportunity to litigate a suppression motion on this ground prior to the time that Fuller testified at trial.  See Commonwealth v. Johnson, 484 Pa. 545, 400 A.2d 583 (1979) (where defendant knew of allegedly suggestive identification prior to trial and failed to file a motion to suppress, he waived any objection when witness identified him at trial).<8>

As the Superior Court noted more recently, whether a trial judge should hear an untimely suppression motion based on the "interests of justice" exception is matter of discretion to be exercised only where the merits of the suppression motion is apparent that justice requires it be heard.  Commonwealth v. Long,  753 A.2d 272 (Pa. Super. 2000).  The only possible grounds for suppressing Mr. Fuller's identification testimony, the allegedly suggestive photographic identification procedure, was a matter of contention.  Indeed, Detective Piree denied Mr. Fuller's claim that he had pointed out

petitioner's photograph prior to Mr. Fuller's identification of it. Based on the conflicting testimony of Mr. Fuller and Detective Piree concerning the circumstances of photographic display, the merits of a suppression motion were by no means apparent. Thus, petitioner could not show he would have prevailed under the "interests of justice" exception if, following Mr. Fuller's mid-trial identification of him, he sought to renew the suppression motion that he had withdrawn before trial. Accordingly, the Magistrate's conclusion that petitioner would have been entitled to litigate a mid-trial suppression motion is unfounded.

Moreover, the possibility that trial counsel could have moved to suppress an identification after the jury had heard Mr. Fuller testify that petitioner was the man who shot him, does not establish that the course that trial counsel actually pursued here -- cross-examining Mr. Fuller concerning his prior failure to identify petitioner at the preliminary hearing -- was so unreasonable that no competent lawyer would have followed it. Even the Magistrate acknowledges that trial counsel's performance in this regard was formidable. The Magistrate, however, apparently was perplexed by the fact that despite 25 years of practicing criminal law, trial counsel testified that he had never heard of a mid-trial suppression hearing. But this hardly overcomes Strickland's strong presumption that trial counsel was effective. On the contrary, counsel's unfamiliarity with filing a mid-trial suppression motion, demonstrates only that, in actual practice, resort to such a tactic is exceptionally rare.

The most common way for defense counsel to deal with a surprise identification is to vigorously cross-examine the witness about his prior failure to make an identification. that is exactly what trial counsel did here. Following Mr. Fuller's in-court

identification, trial counsel immediately elicited that only four months after the crime, at the preliminary hearing, Mr. Fuller had testified under oath that he could not identify petitioner (N.T. 5/25/94, 131). Trial counsel then suggested and Mr. Fuller agreed that "something" had happened during the time between the preliminary hearing and the trial that allowed Mr. Fuller to now identify petitioner. When Mr. Fuller stated that he felt "uncomfortable" at the preliminary hearing, trial counsel belittled this explanation and challenged Mr. Fuller to explain the nature of his "discomfort." Mr. Fuller, who was not particularly articulate on this point, simply repeated that he was nervous at the preliminary hearing and suggested that the proceeding was unfair to him (id. at 132).<9> Trial counsel then read portions of Mr. Fuller's preliminary hearing testimony re-enforcing his prior failure to identify petitioner.

Changing his focus, trial counsel next elicited that, in addition to not identifying petitioner at the preliminary hearing, Mr. Fuller had also told Detective Piree "on more than one occasion" that he was not really sure who had shot the victim (id. at 135). Trial counsel then inquired whether Mr. Fuller had "gone over" his testimony with the assistant district attorney, implying that he was pressured to be a better witness at trial than before, and thus intimating further manipulation of the evidence against petitioner (id.). After emphasizing Mr. Fuller's prior inability to identify anyone at the preliminary hearing, or during initial police questioning, trial counsel then elicited Fuller's testimony about the manner in which Detective Piree allegedly showed him photographs. Fuller agreed that Detective Piree had selected petitioner's photograph from a larger group and asked if he was one of the robbers. Trial counsel also elicited Fuller's opinion that he would not have identified anyone if Detective Piree had not first selected the

photographs.

Because trial counsel effectively impeached Fuller with his prior failure to identify petitioner at the preliminary hearing, petitioner cannot show that trial counsel's decision to forgo the suppression claim fell below an objective standard of reasonableness.

Indeed, in Watkins v. Sowders, 449 U.S. 341, 101 S.Ct. 654 (1981), the Supreme Court refused to find that due process requires that a hearing be conducted out of the presence of the jury whenever a defendant contests the reliability of a witness' identification of him. On the contrary, the Supreme Court observed that the reliability of identification testimony is properly tested where counsel cross-examines the identification witness and argues in summation those factors which might cause doubt as to the accuracy of the identification testimony, including any suggestivity in the identification procedures. Id., 449 U.S. at 348, 101 S.Ct. at 657-658. As the Supreme Court has thus recognized the effectiveness of the very strategy that trial counsel followed here to test the reliability of Mr. Fuller's identification, trial counsel's strategic choice here was not objectively unreasonable. Accord Killebrew v. Endicott, 992 F.2d 660 (7th Cir. 1993)(counsel's decision to challenge the credibility of eyewitness through extensive cross-examination concerning prior failure to identify defendant was a reasonable trial tactic which defeated claim of ineffective assistance based on counsel's failure to object to witness' in-court identification of defendant as robber).

Moreover, as Strickland teaches, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689. That the Magistrate would have proceeded in a different manner than trial counsel did with the respect to

eyewitness Peter Fuller fails to overcome <u>Strickland</u>'s presumption that trial counsel's representation was constitutionally deficient. Accordingly, the Magistrate's finding that trial counsel was ineffective, based on his hindsight re-evaluation of what transpired at trial, fails to conform to <u>Strickland</u>.

Furthermore, trial counsel's strategic choice must not be considered in a vacuum. In the unlikely event that trial counsel had prevailed on a mid-trial motion to suppress and Mr. Fuller's in-court identification was stricken, the jury would have been instructed to disregard the identification, <u>i.e.</u>, to place the genie back in the bottle, the tactical benefit from which is by no means certain. By contrast, the strategy that trial counsel actually employed here -- cross-examining Mr. Fuller about his prior failure to identify petitioner at the preliminary hearing -- was a reasonable means of undermining Mr. Fuller's in-court identification and it had the potential to convince the jury that Mr. Fuller's reliability in general was suspect. For example, trial counsel read aloud those portions of Mr. Fuller's preliminary hearing testimony wherein he had repeatedly indicated that he could not identify either petitioner or the co-defendant, effectively using the witness' own words to undermine his in-court identification. In addition, the jury could observe Mr. Fuller struggle to explain his change of testimony. Moreover, Mr. Fuller's prior failure to identify petitioner when he saw him approximately four months after the crime weighed against the credibility of his in-court identification more than two years later. <u>Commonwealth v. Fisher</u>, 545 Pa. 232, 681 A.2d 130, 141-142 (1996).

The Magistrate has ignored the record evidence which demonstrates that trial counsel effectively undermined Mr. Fuller's in-court identification in favor of his own view that he would have tried the case differently. Neither <u>Strickland</u> nor AEDPA permit the

reviewing court such leeway. On this record, the state court's positive assessment of trial counsel's use of cross-examination to undermine Mr. Fuller's in-court identification, was an objectively reasonable application of <u>Strickland</u> and under AEDPA, its conclusion must be accorded deference.

Finally, the Magistrate's conclusion that petitioner was prejudiced by trial counsel's failure to move to suppress and/or strike Mr. Fuller's identification is also wrong. To show prejudice under <u>Strickland</u>, petitioner must show that it is reasonably probable that the trial outcome would have been different but for trial counsel's "unreasonable" strategy to undermine Mr. Fuller's recovered memory by rigorous cross-examination rather than moving after-the-fact to suppress and/or strike Mr. Fuller's in-court identification.<10>

There are two reasons why petitioner cannot show the requisite prejudice. First, to the extent that counsel made an "error" by not interrupting the trial with a late motion to suppress during Peter Fuller's testimony, this "error" was balanced by counsel's vigorous cross-examination. In other words, petitioner must show that he would have been better off if his counsel had attempted to "put the genie back in the bottle," rather than mount an effective cross-examination. He cannot make this showing. The reality of trials is that an identification, once heard, cannot be un-heard. Petitioner was not prejudiced by his counsel's attempt to attack the identification rather than ask the court to announce that it never happened.

Second, as the record conclusively shows, this was not a case that rose or fell exclusively on the quality of the eyewitnesses' identification testimony. After all, Christopher Young <u>knew</u> petitioner and Shaurn Thomas before the crime. Trial counsel

for both petitioner and the co-defendant recognized that Young's credibility was the linchpin of the Commonwealth's case.  Trial counsel emphasized this in his opening statement wherein he identified Christopher Young as the original source of the allegedly false evidence against petitioner.<11>  Moreover, even if Christopher Young had recanted his prior statements and preliminary hearing testimony implicating petitioner as the shooter -- which he did not do -- Young's prior statements were admissible as substantive evidence under Commonwealth v. Lively, 530 Pa. 464, 610 A.2d 7 (1992) and Commonwealth v. Brady, 510 Pa. 123, 507 A.2d 66 (1986).  This evidence alone, if accepted by the jury, was more than enough to convict petitioner.  Thus, there is no reason to conclude that but for the in-court identification of Mr. Fuller, the jury probably would have acquitted petitioner.  This is particularly true in view of the fact that, at trial, notwithstanding his initial feeble attempt to recant his implication of petitioner, Young ultimately identified petitioner five times as the man who robbed and shot the victim and shot Peter Fuller (N.T. 5/25/94, 65, 80, 82, 89, 91).  The jury, having observed Young repeatedly identify petitioner as the shooter, could conclude, based on Young's trial testimony alone, that petitioner was guilty beyond a reasonable doubt.

Indeed, the record establishes that Fuller's in-court identification of petitioner was, at most, corroborative of Young's repeated testimony that petitioner was the shooter.  After all, Young was the first witness to testify at trial and by the time Mr. Fuller testified, the jury had already heard Young repeatedly identify petitioner at trial as the man who killed Mr. Harry and shot Mr. Fuller.  In addition, Young re-iterated parts of his prior statements implicating petitioner.  Unlike Young, who at both the trial and preliminary hearing had consistently identified petitioner as the shooter, Mr. Fuller's trial

identification of petitioner was impeached by his prior failure to identify anyone at the preliminary hearing. Thus, the jury had ample proof to find petitioner guilty beyond a reasonable doubt without Fuller's in- court identification. While the Magistrate has chosen to characterize Young's trial testimony as "incredible,"[12] he was not empowered to make any credibility determination. A federal habeas court may not re-assess the credibility of witnesses whose testimony it does not hear. Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 851 (1983). The credibility of Young, as well as the weight to be accorded to his testimony, was exclusively a matter for the jury.

Under these circumstances, the Magistrate's conclusion that but for trial counsel's failure to move to suppress and/or strike Mr. Fuller's in-court identification, the trial outcome would have been different is erroneous. Accordingly, the Magistrate's recommendation that the writ be granted must be rejected.

**(4)    In resolving the underlying suppression claim, the Magistrate erroneously placed the burden of proof on the Commonwealth rather than the habeas petitioner, in violation of Third Circuit precedent.    In addition, the Magistrate erred in applying the "totality of the circumstances" test to the challenged identification evidence.**

Based on his erroneous conclusion that trial counsel was ineffective for not seeking to suppress Mr. Fuller's identification either pre-trial or mid-trial, the Magistrate committed additional error by transforming the habeas proceeding into a suppression hearing and re-assigning the burdens of production and proof from the habeas petitioner to the Commonwealth.

The Magistrate's analysis of this part of petitioner's claim does not comport with Third Circuit precedent.  In <u>Reese v. Fulcomer</u>, 946 F.2d 247 (3d Cir. 1991), a habeas petitioner convicted of rape claimed, <u>inter</u> <u>alia</u>, that his counsel was ineffective for failing to file a motion to suppress the witness' identification stemming from six allegedly suggestive out of court identification procedures by the victim.  After setting forth the controlling Supreme Court law, the Third Circuit assigned to petitioner the initial burden of proving that the confrontation procedure was impermissibly suggestive.  <u>Id</u>, at 259, citing <u>United States v. L'Allier</u>, 838 F.2d 234, 239 (7th Cir. 1988).  Based on its review of the circumstances of the various pre-trial identification procedures at issue as established in the record, the Third Circuit held that petitioner had failed to meet his burden of showing that identifications were suggestive.  Accordingly, the Court rejected petitioner's claim that trial counsel was ineffective for failing to move to suppress these identifications.

In light of <u>Reese</u>, the Magistrate Judge erred in requiring that the Commonwealth prove that the photographic identification was not suggestive.  Rather, consistent with

Reese, petitioner had the burden of proving that the identification procedure was suggestive. Because the record here establishes at most, a conflict in the testimony of Detective Piree and Mr. Fuller concerning the circumstances of the photographic identification by Mr. Fuller, petitioner has failed to meet his burden of establishing that the identification procedure was impermissibly suggestive. Indeed, as Mr. Fuller testified at trial, whatever Detective Piree said at the photographic display, did not influence his identification at trial (N.T. 5/15/94, 150). As the Third Circuit observed in Reese, only if the defendant meets his initial burden of demonstrating that the identification procedure was impermissible suggestive will the court consider the admissibility of the evidence under the "totality of the circumstances." Reese, 946 F.2d at 259. Thus, on this record, there was no reason to the totality of the circumstances test under Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375 (1972) and Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 140 (1977).

In any event, the Magistrate erred in the manner in which he applied the totality of the circumstances test. Under Supreme Court precedent, suppression is not warranted following a suggestive identification procedure where it is shown that the identification testimony is nevertheless derived from an independent basis and is therefore reliable. In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967 (1968), a case involving a suggestive photographic identification, the Supreme Court established a two-prong test to determine when out-of-court identifications may be admitted into evidence against the defendant without a due process violation. First, a court must determine whether the out-of-court identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Id. at 384; 88

S.Ct. at 971. The identification's suggestiveness is measured in light of the totality of the circumstances. Should a court find that the identification was not suggestive, the court's due process inquiry ends. If a court finds that the identification was impermissibly suggestive, however, the court's analysis looks to the reliability of the challenged identification. Id.; see also Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243 (1977); Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375 (1972). Factors to consider when judging the reliability of a suggestive identification are:

> (1) the opportunity of a witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the crime, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive iden-
>
> tification itself.

Brathwaite, 97 S.Ct. at 2253, citing Biggers, 93 S.Ct. at 382.

Thus, assuming arguendo, that a suppression court had found that the photographic display was suggestive, the court would then consider whether, in light of the above factors, Mr. Fuller's in- court identification was nevertheless reliable and admissible.

At the preliminary hearing, Mr. Fuller testified that he was playing chess when petitioner announced the hold-up. While the Magistrate emphasizes the fact that Mr. Fuller was concentrating on his game at the point that the crime began, he ignores that Mr. Fuller testified that when he heard petitioner announce the hold-up he looked and saw petitioner pull out a pistol from a distance of two and one-half feet (N.T. 3/25/93, 10-11). He watched as the victim grabbed at petitioner's gun and when a shot rang out,

Fuller dropped to the floor. Fearing that the gunman would kill him, Mr. Fuller attempted to flee by running into the kitchen. When he found the back door locked, he reluctantly returned to the front room where he again confronted petitioner.

At this point, Mr. Fuller estimated that he was approximately eight feet away from the shooter who stood facing him and demanded "Do you want some of this?" As Mr. Fuller again dropped to the floor, he was hit by a bullet in his right shoulder (N.T. 3/23/93, 13-15).

Given the proximity of Mr. Fuller and the level of attention to his armed assailant who, as described by Christopher Young, wore no mask or facial covering (N.T 5/25/94, 35), it is clear that Mr. Fuller had an excellent opportunity to view the man who killed Mr. Harry and shot him. The Magistrate discounted the notion that an individual confronting an armed man threatening to shoot him would have reason to pay attention even though this is borne out here by Mr. Fuller's detailed description of his assailant just hours after the crime. Indeed, the detailed description which happens to match petitioner to a "T" provides clear and convincing proof, in and of itself, that Mr. Fuller viewed his assailant with a high degree of attention and that his opportunity to see him was excellent. Thus, the Magistrate's conclusion that Mr. Fuller's opportunity to view the shooter was less than good is simply not supported by either the record or his own finding that Mr. Fuller's detailed description was indeed accurate. When considered as a whole, Mr. Fuller's testimony about the crime supports a finding that his in-court identification was based on his observations at the time of the crime.

As the record further establishes, there are no discrepancies between Mr. Fuller's description of his assailant on the night of the crime and petitioner's actual appearance.

At the preliminary hearing, Mr. Fuller testified that he gave the following description of the shooter: "I seen real dark skin" which he further described as "rough skin." The shooter was 5'7" or 5'8" and he was approximately 39 to 40 years old (N.T. 3/25/93, 27). Approximately two hours after the crime, in a statement given to police at 3:40 a.m. (admitted at the evidentiary hearing on 9/9/03, as Exhibit "B" and attached hereto), Mr Fuller gave the following description of the shooter:

> He was dark-skinned, thin, about 5'7" to 5' 8" tall. His face had rough skin. It was more like chicken pots (sic) but I just thought he had bad skin. He had on a light weight navy blue jacket about the same length as mine. He had on wranglers. I didn't notice his shoes. He wasn't wearing a hat. His hair was close cut. I don't think he had mixed gray hair.

> About 38 years old he looked to be.

As the Magistrate acknowledged, Mr. Fuller's described petitioner with a high degree of accuracy. In addition to accurately describing petitioner's height weight and age, Mr. Fuller was able to notice the poor condition of petitioner's skin during the crime. Finally, Mr. Fuller was able to remember the clothing worn by the shooter which also demonstrates that his attention was focused on the man who shot him and killed the victim.

Nor did Mr. Fuller identify any one else as the shooter despite being shown approximately 750 photographs of black males at the police photo gallery on January 3, 1993.

While Mr. Fuller did not identify petitioner at the preliminary hearing, he explained that he was not positive and therefore declined to make an identification (N.T. 3/25/93, 16-17). Finally, at trial, Mr. Fuller testified that "whatever Detective Piree said to him"

did not affect his identification of petitioner at trial as the man who shot him (N.T 5/25/94, 150).

The final step of the Biggers/Brathwaite analysis involves weighing any "corrupting effect of the identification procedure" against the above factors.  The Magistrate entirely failed to consider this part of the analysis.  At the preliminary hearing on March 25, 1993, approximately six weeks after the allegedly suggestive photographic display on February 4, 1993,<13>  Mr. Fuller did not identify petitioner, thus, even if the photographic identification procedure had been tainted, it seemed to have no effect.  Indeed, there was no identification at all.  It was not until the trial in May of 1994 that Mr. Fuller identified petitioner.  There is no reason to believe that the effects of the "suggestive" photographic identification disappeared during the preliminary hearing and then re-appeared more than a year later at trial.

On this record, Mr. Fuller's in-court identification was reliable and would have been admissible.  Thus, a motion to suppress Mr. Fuller's identification of petitioner would have failed on the merits.  It is well settled that counsel will never be ineffective for failing to file a non-meritorious motion. Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000); Accord  Kimmelman v. Morrison, 106 S.Ct. 2574 (1986)(failure to file a motion to suppress is not per se ineffective assistance of counsel).  Accordingly, petitioner cannot show that trial counsel was ineffective for failing to attempt to suppress Mr. Fuller's identification testimony.  The Magistrate's contrary finding must be reversed.

**CONCLUSION**

For the above reasons, respondents respectfully request that the forgoing objections to the Magistrate's Report and Recommendation be sustained and that the petition for writ of habeas corpus be denied.

Respectfully submitted,

HELEN KANE
Assistant District Attorney
THOMAS W. DOLGENOS
Chief, Federal Litigation Unit

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLAYTON THOMAS                              :        CIVIL ACTION
                                            :
        v.                                  :
                                            :
BEN VARNER, et al.                          :        NO. 02-4778


**<u>CERTIFICATE OF SERVICE</u>**

I, HELEN KANE, hereby certify that on October 20, 2003, I served a copy of the

forgoing pleading by first class mail, postage pre-paid, on Daniel Silverman, Esquire.

_____
HELEN KANE
Assistant District Attorney
1421 Arch Street
Philadelphia PA 19102
215-686-5742

Attorney ID No. 26096

1Whether trial counsel's strategy was objectively reasonable is a mixed question but, as discussed infra, the state court record amply supported the state court's resolution of this issue.

2References to the preliminary hearing testimony will be designated P.H.N.T., 3/25/93, while the trial testimony will be designated, N.T. with the date on which the testimony occurred.

3The arrest warrant indicates that Mr. Fuller viewed the automatic photo display on January 3, 1993.

4In the PCRA opinion, Judge Greenspan failed to address the claim that trial counsel was ineffective for not moving to suppress and/or strike Mr. Fuller's identification testimony.  Based on its own review of the record, the Superior Court concluded that trial counsel's challenged conduct was dictated by his overall trial strategy of demonstrating that the police had manipulated the evidence against petitioner by coercing and influencing the witnesses to identify petitioner as the shooter.

5The Commonwealth requested an extension of time in which to file objections to the grant of the hearing but this Court determined that the Magistrate's order was not final and therefore denied the request.

6While the Magistrate believes that trial counsel was forced to cross-examine Mr. Fuller about the photographic identification only because, at trial, Mr. Fuller identified petitioner in court as the man who shot him, this is contradicted by the record.  The Magistrate's view simply cannot be reconciled with the fact that -- well in advance of Mr. Fuller's unexpected in-court identification -- trial counsel informed the jury that it would hear Mr. Fuller describe how the detective had influenced his photographic identification of petitioner.  There was no other way for the defense to get Mr. Fuller's testimony about the allegedly suggestive photographic identification in front of the jury other than to question Mr. Fuller about this procedure.  After all, at the preliminary hearing Detective Piree had testified that he did not single out petitioner's picture prior to Mr. Fuller's identification of the photo.  Thus, trial counsel's cross-examination of Mr. Fuller was consistent with the strategy that he outlined in his opening statement.  Accordingly, the Magistrate conclusion that trial counsel did not intend from the beginning of the trial to introduce Mr. Fuller's version of the photographic identification is contrary to the record. See McAleese v. Mazurkiewicz, 1 F.3d 159, 168 (3d Cir. 1993) (Third Circuit rejected district court's assessment of trial counsel's decision not to call a potential alibi witness as a post hoc rationalization where record established that counsel's decision was reasoned, strategic choice).

7Report and Recommendation, at 16.

8To the extent that the Magistrate suggests that until Mr. Fuller positively identified petitioner at trial, there was no "opportunity" to raise a suppression claim, he is mistaken.  The only ground to support suppression of any identification by Mr. Fuller

was the allegedly suggestive photographic display which was revealed more than one year before trial.  Under these circumstances, trial counsel could not convincingly claim that he had no prior opportunity to raise a suppression claim particularly here, where he had filed a suppression motion and withdrawn it.  See Commonwealth v. Page, 246 Pa. Super. 380, 371 A.2d 890 (1977) (court did not abuse discretion in denying request to file late suppression motion "in interests of justice" where defendant who had been in hospital for three months prior to trial was represented by the same counsel throughout relevant time).

9As the Magistrate observes, albeit in another context, Mr. Fuller's proffered explanation at trial for his inability to identify petitioner at the preliminary hearing was thoroughly unconvincing.  See Report and Recommendation, note 5, at 29.   The Magistrate's assessment of Mr. Fuller's weak response to this line of questioning demonstrates that trial counsel's cross-examination of Mr. Fuller was indeed effective.

10Because the state court found that petitioner did not establish the performance prong of his claim of ineffective assistance, it had no occasion to consider the prejudice prong. Of course, this was a reasonable application of Strickland which expressly held that a court reviewing a claim of ineffective assistance need not evaluate both prongs where it is clear that defendant has failed to make the necessary showing with regard to either one of the two prongs.   466 U.S. at 697 (court reviewing ineffectiveness claim need not consider both components of the ineffectiveness where defendant fails to meet one).

11Similarly, as counsel for the co-defendant told the jury, the only thing that was holding these defendants was a vicious lie by a person, i.e., Christopher Young, with a suspicious background, who told the police that the defendants' names only after the police threatened to arrest him for the crime (N.T. 5/24/94, 103).


12Report and Recommendation (9/29/03), at 31.

13The date on which Detective Piree showed the photographic display containing petitioner's photograph to both Christopher Young and Peter Fuller was February 4, 1993.  This date is reflected on the written statement which Detective Piree prepared and Mr. Fuller signed, memorializing his identification of petitioner's photograph.  This statement was admitted at the evidentiary hearing on September 9, 2003 as Exhibit "B" and is attached hereto.

There is a discrepancy concerning the date of the photographic display in the trial record where it was suggested to Detective Piree in a question by defense counsel that the photographic identification occurred on February 14, 1993 (N.T. 5/25/94, 219).  Prior to this, the detective had requested an opportunity to confirm the date by reviewing his paperwork on the subject but he was not afforded an opportunity to do so.  On re-direct, the prosecutor corrected the date and referred to the photographic identifications as having occurred on February 4, 1994 (N.T. 5/25/94, 220).